[No. S008112. Aug. 30, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR HANS HALVORSEN, Defendant and Appellant.

380

## COUNSEL

Lisa M. Romo, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Lawrence M. Daniels and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—A jury convicted defendant Arthur Hans Halvorsen of two counts of first degree murder (Pen. Code, § 187; unless otherwise specified, all statutory references are to the Penal Code), one count of attempted murder (§§ 187, 664), and one count of assault with a firearm (§ 245, subd. (a)(2)), a lesser included offense of the charged offense of attempted murder. The jury found true allegations that defendant used a firearm in the commission of all of the offenses (§ 12022.5) and multiple-murder special-circumstance allegations relating to the first degree murder counts (§ 190.2, subd. (a)(3)). After a penalty phase, the jury fixed the penalty at confinement in state prison for life without the possibility of parole for one of the murder counts, but was unable to reach a verdict for the remaining murder count. The trial court declared a mistrial as to that count. After retrial on the penalty for that count, a second jury fixed the penalty at death. The trial court denied defendant's motion for new trial and application for modification of penalty, and sentenced him accordingly.[1] This appeal is automatic. (§ 1239, subd. (b).)

---

[1] On the noncapital counts and enhancements, the trial court sentenced defendant as follows: as to count IV, attempted murder, the upper term of nine years, plus three years for the intentional infliction of great bodily injury within the meaning of section 12022.7, plus two years for the personal use of a weapon under section 12022.5, for a total of 14 years; as to count III, assault with a firearm in violation of section 245, subdivision (a)(2), one-third of the midterm or one year in state prison, plus an additional year for the intentional infliction of great bodily injury under section 12022.7, plus two years, stayed, for the personal use of a weapon under section 12022.5, for a total of two years, to run consecutively to the sentence on count IV; as to count I, murder, life without the possibility of parole, plus two years, stayed,

For the reasons that follow, we affirm defendant's convictions and noncapital sentences, vacate one of the multiple-murder special-circumstance findings, and reverse the judgment as to the sentence of death.

## I. FACTUAL BACKGROUND

### A. *Guilt Phase*

#### 1. *Summary*

On Sunday, March 31, 1985, defendant, a 43-year-old self-employed contractor who lived in Long Beach with his wife and two daughters, shot four men in three separate incidents, killing two of them. The prosecution's theory was that defendant premeditated and deliberated the killings. The defense sought to show that the crimes resulted from the combination of defendant's mental illness (bipolar disorder), heavy alcohol consumption, and mounting financial pressure.

#### 2. *Shooting of Benjamin Alcala*

In the first incident, defendant approached an apartment building on Santa Fe Avenue in Long Beach where Benjamin Alcala lived with his wife, his sister, and her husband, Roberto Martinez. Alcala was in the yard, planting flowers and using a knife to dig in the dirt. Defendant confronted Alcala, who did not know defendant but had seen him some days earlier, and asked for Martinez. Alcala told him Martinez was not at home. Defendant walked away, toward the street.

Defendant soon returned, holding a handgun. He told Alcala he wanted to go into the house to look for Martinez. Alcala assented and walked toward the door, leaving the knife in the garden. About four feet from the door, defendant struck Alcala with the gun on the side of his head. As Alcala opened the outer screen door, defendant fired a shot to one side of him. As Alcala opened the inner door, defendant—who was nine or 10 feet behind him—fired again, hitting Alcala near the shoulder on the left side of his back. The bullet exited his right shoulder. Alcala fell to the ground and lost consciousness, but survived the shooting after spending seven days in the hospital.

for the finding under section 12022.5, to run consecutively to the sentences on counts III and IV; all to terminate and be deemed served when the sentence of death imposed as to count II is actually executed.

### 3. *Murders of Calvin Ferguson and Vicente Perez*

Calvin Ferguson worked in the vacuum truck business in the Signal Hill area of Los Angeles County, which was known for oil-related businesses. He owned an 18-wheel truck and leased it to the Hammett Vacuum Service, located at the intersection of McDonough and I Streets in Wilmington. Between 5:15 p.m. and 5:30 p.m. on March 31, 1985, Calvin and his brother, Delton Ferguson, went to the Hammett premises to perform mechanical work on Calvin's truck in preparation for a trip to Ventura. About 6:00 p.m., Delton was looking at a map book in Calvin's personal vehicle, having parked his own vehicle some 50 feet to the west of Calvin's. Defendant drove his yellow pickup truck into the area and yelled to Calvin, while rolling northbound on McDonough. Calvin walked toward defendant's truck. Within a minute, a shot was fired. Shortly thereafter, Delton looked up and saw Calvin lying on the ground and defendant's truck pulling away. Delton ran to his brother, who was bleeding from the head.

Vicente Perez's brown car, which had a 12-foot radio antenna and bore a "911" sticker and a seal with the words "Community Alert Patrol," pulled up to the side of defendant's pickup truck soon thereafter. Both vehicles stopped, and defendant and Perez were side by side in their respective vehicles. Defendant leaned out of his truck, extended his arm, and fired his gun.

Delton Ferguson heard the shot and saw Perez's car proceed southbound on McDonough through the intersection with I Street and crash into the fence surrounding a nearby junkyard between I Street and Anaheim Street. The car's tires were spinning, and its engine was running fast. As Delton ran to his own vehicle, defendant's truck made a U-turn and then turned westbound on I Street, driving past Delton. Defendant had a "cold" demeanor as he drove by. (Delton had met defendant twice before the shootings; after viewing a photographic lineup and concluding defendant's picture could have been that of the shooter, Delton identified defendant at the preliminary hearing and at trial. To Delton's knowledge, Calvin had never met defendant. Delton testified there was no hostility between himself and defendant.) Delton parked his vehicle behind Calvin to block traffic, ran to the telephone in Hammett Vacuum Service's yard, and called the police.

An officer responding to the scene found the engine of Perez's car still running and turned it off; Perez was slumped dead in the seat with his foot

lodged against the gas pedal. He had suffered a gunshot entry wound on the left side of his neck with the corresponding exit wound on the right side of his neck. Calvin Ferguson lay dead in the street, a bullet entry wound above his right upper lip and the corresponding exit wound on the back of his neck.

### 4. *Attempted Murder of Eugene Layton*

Eugene Layton, a former professional football player, testified that he became acquainted with defendant in the course of Layton's roofing and long-haul trucking businesses. On various occasions, Layton had purchased from defendant roofing gravel and used refrigerators, as well as discounted soda pop for a youth football league that Layton coached. Layton had never had any physical altercations or problems with defendant.

Within a few months before the March 31, 1985, offenses, defendant had tried to cash a $1,000 check at a bar called Curley's, which Layton frequented. The bartender, who did not know defendant, refused to cash the check until Layton vouched for him. Later, Layton learned defendant's check had bounced and, viewing the matter as his responsibility, went to defendant's house to see that defendant repaid the money. Defendant gave Layton $400 or $600 in cash that day, claiming he had money problems, and eventually repaid the remainder. At the time of the offenses, Layton testified, there was no outstanding debt between himself and defendant.

On the evening of March 31, 1985, Layton was at his home on Vista Street in Long Beach with his 13-year-old son and 10-year-old daughter. He was not expecting any visitors and was in the shower at some point between 7:00 p.m. and 8:00 p.m., when his son told him someone at the door wanted to see him. Layton got out of the shower, put on shorts and a T-shirt, and headed to the front door, where defendant was standing. Layton, who had not known that defendant knew where he lived, was surprised to see him and told him to wait while he dressed. Layton did not know why defendant had come to his home, but thought perhaps he wanted to borrow money or arrange a business transaction. Layton walked toward his bedroom, but then felt "strange" and turned around. Defendant, who had not said anything, was standing about five to six feet behind him. When Layton asked what he was doing, defendant raised a gun and said: "You're dead, Gene, you're dead." As Layton asked why, defendant shot him in the left side of his upper chest from a distance of less than three feet. The shot knocked Layton backward two or three feet into the wall. Layton screamed for his children to leave the house and was

grabbing for defendant when defendant fired a second shot, hitting Layton near the right nipple. Layton, who was six feet five inches tall and weighed about 270 pounds, pushed defendant backward into a china cabinet in the dining room, smashing a glass pane. Defendant and Layton lay on the broken glass. Layton pinned defendant down by the throat and grabbed defendant's gun with his left hand. He pulled the trigger two or three times but the gun did not fire, so he let go of it. Layton grabbed a piece of broken glass and cut defendant's throat. Defendant said: "You got me, Gene. I'm dead. I'm dead."

Believing he had killed defendant, Layton managed to crawl to the front door of the house, across the lawn, and to the sidewalk, where paramedics treated him. Layton later was admitted to the hospital and underwent surgery.[2]

## 5. Defense Case

### a. Defendant's deterioration before the shootings

The defense called several members of defendant's family to testify about how defendant's behavior had changed in the period preceding the offenses. Amalia Diaz Halvorsen, defendant's wife, testified that although defendant drank alcohol infrequently when they first met, beginning two years before the shootings his drinking increased. He drank beer, whiskey, and wine and drank every day. He began to use foul language, which he had not done before, and experienced memory lapses. A few weeks before the shootings, defendant was drinking more and became drunk nearly every night. Although he was not violent toward Amalia or their daughters, he would throw things around the house. Defendant was tense, nervous, and restless and slept little; he worked long hours every day of the week. Defendant had been deeply upset to learn, a few months before the shootings, that a cousin had committed suicide because defendant had failed to repay a debt he owed him. One night, a month or two before the offenses, defendant awoke screaming that someone was coming to get him. A few weeks before the offenses, defendant, who had not spanked their daughters since they were young, hit his stepdaughter Meri in the face with his fist when she "smart-mouthed" him in response to his questioning about her alcohol-related arrest. On March 22,

---

[2] Defendant was arrested at the hospital after receiving emergency treatment in the same rescue unit as Layton, who told officers the man lying next to him was the person who had shot him.

1985, some nine days before the shootings, Amalia and defendant signed papers to obtain a $16,000 loan from a man named Wendell West, putting up their house and everything they owned as security. They were obligated to pay West $30,000, plus 10 percent interest, on April 21, 1985.

Brandy Halvorsen, 22 years old and a senior at California State University, Long Beach, at the time of trial, testified that in March 1985 she was living at her parents' home on Stanton Place. Previously, at the age of 17, she had moved out. Brandy testified that when she returned to the family home some two months before the offenses, defendant, her stepfather, was not the same; he seemed to become angry at anything, his behavior was unpredictable, and he would become verbally abusive to her and her sister Meri when he drank.

Berdecia (also known as Clara) Diaz, defendant's mother-in-law, testified that for eight years she and her husband had lived next door to Amalia and defendant. Defendant had helped them with household tasks and had lent them money to buy their house. But in February and March 1985, defendant seemed to change; he was nervous, rarely came to visit as he had before, and was not in as good a mood or as affectionate as he had been before.

Herbert Ellsworth was married to a sister of Amalia Halvorsen. About two weeks before defendant was arrested, he asked Ellsworth for a loan of $1,500. Ellsworth was unable to lend the money. Defendant was pleasant, but avoided eye contact and looked nervous, as if he were under stress.

b. *Events of March 31, 1985*

Amalia Halvorsen testified that on March 31, defendant left the house at 6:00 a.m., returned at 9:30 a.m., and then left again. She expected him home at 6:00 p.m. that evening for a dinner engagement with Wendell West and his wife. West called several times that day to see if defendant was home in order to confirm their dinner plans. Finally West told Amalia to tell defendant they would get together another day.

William Destro testified that on a Sunday in March 1985, from sometime between noon and 1:00 p.m. to about 5:00 p.m., he played pool and discussed a possible business deal with defendant at the Anchor Inn, a bar in Long Beach. When Destro first saw defendant, defendant's speech was slurred and he appeared to have been drinking; defendant drank beer throughout the afternoon. Destro wanted to buy 100 gold chains from defendant at $400 each

and resell them at a profit. Defendant indicated the chains were on a ship in the harbor. Both defendant and Destro were to put up substantial deposits to get a sample of 10 to 15 chains, which Destro would have tested the next day. If the chains proved to be of the quality Destro desired, he would purchase the balance of the 100 chains. Defendant's share of the deposit money was in checks, a handful of which Destro saw, and which defendant asked the bartender at the Anchor Inn to cash. The bartender, who was Destro's wife, told defendant she did not have authority to cash a $1,500 check and tried to contact the manager for approval.

Over the course of four hours, while waiting for the manager to arrive and approve the transaction, Destro and defendant played about 10 games of pool, eventually playing for double or nothing. Destro testified he won all of the games, and by the end of the afternoon defendant owed him $9,000. Defendant behaved in an increasingly loud, erratic fashion, slapping his pool cue against the table and cursing, kicking the pool table, and pushing barstools. His behavior seemed out of proportion to the circumstances. People at the bar told defendant to calm down and warned Destro that defendant "was the kind of fellow that you don't want to beat at pool." Several times Destro told defendant to forget about the wager, but defendant would insist on playing another game to get even.

As the afternoon wore on, Destro came to believe he had wasted his time because defendant did not have the money for the deal. Destro left the Anchor Inn with his wife about 5:30 p.m. or 6:00 p.m. Destro felt bad about beating defendant at pool because defendant was intoxicated, and he told defendant to forget about the $9,000 debt. Defendant insisted he would pay Destro when he got his checks cashed.

Destro was certain defendant was the person he had met at the bar because, when he returned to the Anchor Inn a couple of days later, the manager showed him a newspaper article about the shootings.

About 8:00 p.m. or 9:00 p.m. on the evening of the shootings, Amalia Halvorsen received a telephone call from a doctor, who informed her that defendant was in the hospital. He had been stabbed in the neck and was in critical condition.

### c. *Toxicologist's testimony*

Ernest Lykissa, Ph.D., chief toxicologist at Long Beach Memorial Medical Center, testified that defendant's blood-alcohol level at 7:40 p.m. on March 31, 1985, was .154 percent. A man weighing 150 pounds would have to drink seven drinks during the two hours before testing to achieve this level. For a

man weighing 180 pounds who had stopped drinking two hours before the test, this level would require the consumption of 10 drinks.

Dr. Lykissa testified that alcohol consumption affects cognition, social behavior, and moral values; lowers inhibitions; and has an impact on coordination, reflexes, and judgment. At a blood-alcohol level of .10 percent, the skills needed to operate a car are highly impaired. Although the effects of alcohol vary with each individual, in most instances a blood-alcohol level of .154 percent causes a grave degree of impairment. A habitual drinker may appear to behave more normally while intoxicated than a casual drinker because the former has learned ways to mask his impairment, but his judgment is nevertheless impaired.

### d. *Psychiatrist's testimony*

William Vicary, M.D., a forensic psychiatrist, interviewed defendant in jail several times and reviewed numerous records, including reports from a psychiatrist at the University of California, Los Angeles (UCLA), and Psychologist Michael Maloney, in connection with defendant's case. Dr. Vicary agreed with the UCLA psychiatrist's opinion that defendant was suffering from manic depression, also known as bipolar disorder. Dr. Vicary believed defendant had a psychotic disorder characterized by paranoia, as well as symptoms of depression. In Dr. Vicary's opinion, defendant had been developing this disorder for the two to four years before the shootings and continued to suffer from it at the time of trial.

Dr. Vicary agreed with Dr. Maloney's conclusion that defendant was "faking well," i.e., attempting to portray himself as mentally healthy, and did not believe defendant was malingering as to his bipolar symptoms. Dr. Vicary testified that defendant had a significant family history of mental illness, with nine relatives suffering from serious mental problems. Defendant's mother had suffered from a psychotic illness since her twenties, had attempted suicide and had been hospitalized for mental illness several times, and at the time of trial was committed to an institution. Defendant's older brother suffered from a psychotic mental illness and had been hospitalized. An uncle had committed suicide. A second cousin also had a psychotic mental illness and had committed suicide. Two paternal half brothers had histories of alcohol abuse.

Dr. Vicary testified that defendant's alcohol use exacerbated his mental illness. Persons with manic depression often use alcohol to self-medicate by "mellowing out" their agitation and anxiety, but because alcohol is a central nervous system depressant, in the long run it makes their symptoms worse. Dr. Vicary believed defendant was using alcohol in an unconscious effort to

calm himself and, although alcohol did not cause defendant's psychosis, it made him more likely to act on the basis of his paranoid ideas.

Dr. Vicary reported that defendant had become extremely interested in religion while incarcerated. Defendant spent virtually all of his time reading the Bible, and he tried to convert Dr. Vicary and his trial counsel to his religious beliefs. At first Dr. Vicary thought defendant's new interest in religion was that typical of jail inmates, but then saw that it was of such fervor and conviction, to the exclusion of virtually everything else, that it seemed to be part of his mental illness.

Dr. Vicary acknowledged that defendant had lied to him, denying his involvement in the Perez and Ferguson shootings, although he had previously admitted responsibility to the UCLA psychiatrist. Defendant also lied to Dr. Vicary in his explanation of the shootings of Alcala and Layton. Dr. Vicary further acknowledged that financial problems, as well as mental illness, could cause agitation and that if defendant had been threatened by persons who had lent him money, he might have a rational rather than a paranoid reason for awakening with nightmares. Dr. Vicary testified that defendant was psychotic at the time of the shootings, which he believed were part of his agitation and his mental disorder, but over defense counsel's objection, Dr. Vicary acknowledged he did not believe defendant's mental illness provided the basis for a psychiatric defense.

e. *Defendant's testimony*

Defendant testified he made his living by buying stolen equipment and, he claimed, "cutting up" the automobiles of people who could not afford to pay for them. He owned a soda pop distributorship that served as a "front" for his illegal activities. He drank habitually and increasingly in the years before his arrest. He had owned the gun he used in the shootings for about a year and normally kept it fully loaded in his truck at all times. He had known Eugene Layton since 1979 and "was not on good terms with him," although Layton "might have thought that he was." He had sold Layton some $1,500 worth of equipment for which Layton did not immediately pay in full, claiming lack of funds. Defendant intentionally wrote the check for which Layton vouched at Curley's bar on insufficient funds, testifying he thought getting even with Layton would be fun.

Defendant had been in bankruptcy since 1981, testifying he filed in order to keep creditors from foreclosing on his house, and the bankruptcy was a "scam to get the creditors off [his] back." Defendant had had several dealings with Wendell West and had no fear of him. In March 1985, defendant had no "major" financial worries, but testified that "when you have greed in your

heart, you always have financial worries. [¶] Greed never quits; there is no limit." About March 22, 1985, West lent defendant $16,500, of which $1,500 was a month's interest. West wanted several vehicles and the deed to defendant's house as security for the loan; defendant also executed a bill of sale for $500,000 worth of merchandise in defendant's three storage yards. If defendant did not repay the loan in full on April 21, 1985, West could take his house as security. Defendant never told West that he was in default on his mortgages.

In 1984 or 1985, defendant worked for about one week as a diesel tractor-trailer driver for Hammett Vacuum Service. Later, defendant conceived a plan to dismantle a 130-foot steel tank on the Marlex refinery property in Signal Hill, haul the steel away, and sell it. The tank held toxic waste, and defendant believed Hammett would illegally remove the waste for a share of the profit from the venture. Defendant told Hammett's dispatcher that he wanted to see Hammett in order to talk about some business schemes. To get Hammett's attention, defendant gave the impression that he was going to extort him, telling the dispatcher that unless Hammett gave him $10,000, defendant was going to the police. Hammett "misunderstood" him, defendant testified.

Defendant testified about an incident on March 9, 1985, in which he accused two men of stealing soda from his truck and told them to return the soda within an hour or he would "blow [their] fucking head[s] off," drawing his gun as he did so. He had seen the men in his yard and believed they took the soda. The police later came and asked defendant about the incident.

About a week before March 31, 1985, Layton owed one Ray Vasquez $10,000. Defendant told Vasquez, who was "dissatisfied" with Layton, that he would "straighten things up." Defendant learned Layton's home address by phoning Layton's wife, lying to her by stating he was a customer, and asking her where she wanted the check sent. He did so in order to shoot and kill Layton.

On March 31, defendant left his house around 7:00 a.m., drove his yellow pickup truck to a restaurant near the Long Beach Airport, and met with some men about purchasing stolen equipment. He bought two generators from them, depositing one at one of his storage yards and taking the other home, where he stayed for about 45 minutes.

Defendant next went with his wife to a bank, withdrew a couple of hundred dollars to pay what he owed for the generators, and took his wife back home.

One of defendant's drinking friends, "John John," had set up a meeting between defendant and William Destro, and defendant went to the Anchor Inn

to meet Destro. Defendant was planning to "fence a fortune" in stolen gold that was somewhere in Long Beach, although defendant did not know where. At the Anchor Inn, defendant drank quite a bit of whiskey and beer. He and Destro played pool for money. Defendant beat Destro, who owed him $6,000 before the last game. Destro won the last game double or nothing, so they were even. Destro lied, according to defendant, when he testified he beat defendant at pool and when he said defendant was drunk and sloppy at the bar.

Defendant had about $3,000 in checks with him on March 31, 1985. He was unable to cash a $1,000 check at the bar because the manager did not have that much reserve. But the gold deal was never made because Destro did not produce any cash.

While defendant was at the Anchor Inn, a "dope fiend" named Roberto Martinez, who worked for defendant as a thief and who, like defendant, had "larceny in his blood," came by. Defendant lent him and his friends $25 or $30.

Defendant left the bar about 5:30 p.m. When he stepped outside, he "felt like [he] had just walked into a refrigerator" and as though he were falling backwards into the bar. He had an eerie feeling he had never experienced before. He did not know how much he had had to drink, but he was intoxicated when he left the Anchor Inn. Going to his truck, he saw that an air compressor that he had told Martinez to put there was not in the truck. He decided to go to Martinez's house to find out where the compressor was.

Defendant took a gun from his truck and went to Martinez's nearby apartment. Defendant knocked at the door, and Benjamin Alcala answered. Defendant did not recall Alcala holding a knife or an ice pick. Alcala lied when he testified he had a knife and was working outdoors when defendant arrived. Alcala stepped out of the door. Defendant confronted Alcala, who spoke in a "halting, jerky type English" that angered defendant for some reason. Defendant asked Alcala where Roberto Martinez was. Alcala said he did not know, and defendant thought he was not being truthful and was shielding or hiding Martinez. Defendant pointed the gun at Alcala and fired it once at his midsection from about 18 feet away. He did not intentionally pull the trigger and must have done so accidentally. Alcala's wife came out of the house, started crying, and went to assist him. When defendant left, he believed Alcala was only superficially wounded. Alcala was lying when he testified that defendant shot him in the back near his shoulder; the police officer who gave similar testimony was misinformed or lying as well. Defendant did not remember whether he had hit Alcala with the gun.

After the shooting, defendant thought to drive to Hammett Vacuum Service, where he had worked for a week as a truck driver. From Alcala's residence it took three or four minutes to drive to Hammett's. Defendant did not expect the business to be open or anyone to be there.

Defendant had seen Calvin Ferguson around town a couple of times, but did not know him; he had met Delton Ferguson once or twice. Defendant drove up to McDonough and I Streets, stopped his truck, and saw Calvin Ferguson. Calvin walked to within four feet of defendant and said something to him; defendant could not remember what. Defendant pointed his gun at Calvin's face from a distance of two to three feet and pulled the trigger, intending to kill him. Defendant testified he had no explanation for why he shot Ferguson.

After shooting Ferguson, defendant drove forward on McDonough Street about 50 or 100 feet. Vicente Perez drove toward defendant and pulled up alongside him, and both men stopped their vehicles. Defendant did not know Perez, but may have recognized him from the area. Perez partially rolled down his window and said something to defendant. Defendant pointed his gun at Perez's head and pulled the trigger, intending to kill him; he did not know why. Perez slumped over the steering wheel. His foot hit the accelerator, and the car started forward at a high speed and crashed into a pole.

After defendant killed Ferguson and Perez, he was "laughing about it." He made a U-turn and headed toward the freeway to drive to Layton's house on Vista Street in Long Beach. He took a roundabout route in order to avoid the police, taking 10 to 15 minutes to get there.

Defendant testified that Layton and his associates owed some people about $500,000, and these people were going to pay defendant to collect it for them. He went to Layton's house to tell him it was time to pay up. Defendant further testified Layton owed one of defendant's friends $10,000, which he additionally intended to collect. Defendant also acknowledged he planned to "take care of" Layton, meaning to kill him. Inconsistently, however, defendant also testified that when he went to Layton's door he did not intend to kill him, but wanted to wound him and cause him pain.

Holding a gun to his side, defendant approached the door and knocked. Initially no one answered. Then one of Layton's children answered the door and let defendant in. Fifteen seconds after defendant entered the house, he shot Layton in the sternum, saying: "Gene, you're dead." Layton came towards defendant and cut his throat twice with glass from a china cabinet. Layton was on top of defendant, the hole in his chest over defendant's nose. The only time defendant feared dying during this incident was when he

thought he was going to drown in Layton's blood. After Layton got off of him, defendant walked into the kitchen. Layton followed, so defendant shot him again in the abdomen.

Defendant left Layton's house through the back door and decided to go down the street. An ambulance stopped, and the paramedics put defendant into it, then drove around the block and picked up Layton. Defendant told the jury: "We were both in the same meat wagon."

When defendant spoke to the police at the hospital, he was intoxicated and intentionally babbled incoherently. He did not recall what he said to the officers who interrogated him, but 90 percent of it was lies. He tried to "con" the police about having nothing to do with the shootings of Ferguson and Perez, telling them he went from the scene of the Alcala shooting "to Gene's place, the other guy's house that I had to shoot." This was true in part, because Layton had been on defendant's list of people to shoot, but false in part because it omitted reference to the two fatal shootings. Defendant also lied to the police about having shot Layton in self-defense and about not knowing how many times he had shot him. The day after the shootings, officers from the Long Beach Police Department interviewed defendant, and he lied in a "blatant" manner about how the killings happened. He also lied about the Alcala shooting. For about a year after the offenses, defendant maintained he had nothing to do with the killings. Until the trial, he lied to everyone other than his wife in claiming that he did not commit the killings. He lied to Dr. Vicary and to his attorney because he was not willing to confide in them.

Defendant alluded to his religious beliefs, stating he had tried to read the Bible to Dr. Vicary and his attorney, but they would not listen. Defendant believed his attorney had been "deceived" because he was raised a Catholic. The prosecutor and the jurors, he said, were also heathens who, like defendant, had been deceived.

Defendant testified he was glad Layton had survived, but stated, in relation to Ferguson and Perez, "I don't weep for the dead, I weep for the living." Although he knew murder was wrong, defendant asserted that "[murder] is one of the minor crimes that I have done." When asked what was worse than murder, defendant answered: "Sacrificing honor and virtue is 100 times worse. [¶] There is one thing that is the worst of all that I can think of and that is to ignore the Gospel of Jesus Christ."

### 6. Rebuttal

Joe Joosten was a mechanic with a small work yard on Cherry Street in Signal Hill. He had met defendant about a year before he was arrested.

Joosten knew Calvin Ferguson, used to see him in the afternoon at a restaurant that defendant frequented in the morning, and once directed him to one of defendant's storage yards, although Joosten did not know whether Ferguson actually went there. About two weeks before the shootings, Joosten was in defendant's yellow pickup truck with defendant and noticed a list in the dashboard area with at least 12 names and numbers on it.

### B. *First Penalty Phase*

The prosecution presented no additional evidence.

In mitigation, the defense presented the testimony of defendant's aunt, father-in-law, and stepdaughter concerning defendant's upbringing, his good deeds before the crimes, and his character, respectively. Dr. William Vicary also testified again on defendant's behalf.

As noted above, the jury returned a verdict of life imprisonment without the possibility of parole for the murder of Calvin Ferguson. After seven hours of deliberations, the jury was unable to reach a unanimous verdict for the murder of Vicente Perez, and the trial court declared a mistrial as to that count.

### C. *Penalty Retrial*

#### 1. *Prosecution Case*

The prosecution presented to the new jury substantially the same evidence that it had presented during the guilt phase of defendant's first trial.

#### 2. *Defense Case*

##### a. *Defendant's testimony*

Defendant testified in his own behalf. He admitted shooting Alcala, Ferguson, Perez, and Layton and stated he preferred "the gas chamber" to life imprisonment without the possibility of parole.

Defendant acknowledged that on March 22, 1985, he borrowed about $15,000 from Wendell West and gave "everything" he had as security if he failed to repay the loan by April 21. Although in 1985 he sometimes ran short of money, at the time of his arrest he was functioning and felt "no pain" from his bankruptcy. He routinely drove his yellow pickup truck with a loaded gun in the glove compartment. He was addicted to alcohol and habitually deceived and lied to people.

Testifying about the events of March 31, 1985, defendant stated that on that day he bought breakfast for some people at a restaurant, returned home and asked his wife to get money from a bank machine, and unsuccessfully tried to get several checks cashed, including one for $1,000. He testified he met with William Destro at the Anchor Inn bar about a possible deal involving gold chains, but Destro had no money for the deal. The amount of alcohol defendant drank that day was typical for him or perhaps even less than he ordinarily drank. Defendant and Destro ended up gambling over pool. Defendant denied owing Destro money and claimed that by 4:00 p.m. Destro owed him $5,000. Defendant claimed he played the next game for double or nothing and let Destro win. Defendant disagreed with Destro's testimony that he was staggering or slamming barstools around; he may have been "a little bit sloppy," but he had learned to "maintain a measure of awareness of [his] actions" and did not consider himself "falling down drunk."

When he left the Anchor Inn about 5:00 p.m., defendant experienced a strange sensation, like he was stepping into a refrigerator. Walking to his truck, he saw that some equipment he expected to be there was not. He had told a man named Roberto, who earlier had come into the Anchor Inn, to put the equipment on his truck, but Roberto had not followed his instructions. Defendant decided to go to Roberto's apartment, which was across the street from the Anchor Inn, to see what had happened. Thinking Roberto might be drunk with his "homeboys," defendant took his gun out of his glove compartment. He made no effort to conceal the gun as he approached the apartment. He confronted Benjamin Alcala, struck him with the gun, and shot him. Defendant testified he had no recollection of pulling the trigger. He claimed he was eight to 10 feet away from Alcala when he shot him, although he acknowledged he had testified in the first trial that he was 18 feet away. When confronted with his statement to police that he was two feet away from Alcala when he shot him, defendant asserted that was a lie.

Leaving the vicinity of Alcala's apartment, defendant drove down Anaheim Street toward Wilmington, turning right onto McDonough Street toward I Street. Around 5:30 p.m., he arrived at Hammett Vacuum Service, where he had briefly worked as a truck driver the previous year. He did not know his purpose in driving to that area. Defendant knew of Calvin Ferguson and Vicente Perez, but did not know them well and had no bad blood with either of them. From the intersection of McDonough and I Streets, defendant saw Delton Ferguson sitting in a car and Calvin Ferguson standing next to him. Defendant did not recall yelling at Calvin and thought Calvin had just approached him. He thought Calvin might have said something to him, although he did not remember what it was. He admitted shooting Calvin and intending to kill him, stating: "When you put a gun in someone's face and pull the trigger, what else could you reasonably expect."

After shooting Calvin, defendant pulled forward 75 to 100 feet. Another car approached, and defendant stopped his truck. The car stopped; defendant leaned out of his window and shot Perez in the neck, intending to kill him. He laughed after the shooting and watched Perez's car crash into the fence. Defendant testified he did not know why he intended to kill Perez, denying he perceived Perez as a threat or that he killed Perez because he was a witness to the Ferguson shooting.

Defendant left Hammett Vacuum Service, driving down I Street to the Terminal Island Freeway. He drove to Eugene Layton's house in Long Beach. He had last seen Layton about three weeks earlier, when Layton had come to his yard about a $1,000 check Layton had vouched for, which had been returned for insufficient funds. Defendant acknowledged he entered Layton's house intending to shoot him, but denied intending to kill him. He admitted he had financial problems around the time of the offenses, but claimed he felt "no pain" from his bankruptcy.

### b. *Defendant's statement*

With the court's permission, defendant made a two and one-half hour statement to the jury. He talked about books he had read and songs he had heard in jail; a violent attack on him by five other inmates; and his moral, religious, and philosophical views. He repeatedly urged the jurors to repent, extolled the Book of Mormon as the word of God, and referred to the Holocaust as "an indicator of what happens to people that do not receive God." The court then allowed the prosecutor to cross-examine him. Defendant acknowledged his guilt; agreed that he had addressed the jury in part because he did not want another hung jury; and stated that if he had to choose between life imprisonment without parole and the death penalty, he would choose death. When asked whether he was sorry for his actions, defendant said: "I cry for the living, not the dead."

### c. *Psychiatric testimony*

Forensic Psychiatrist Kaushal Sharma, M.D., evaluated defendant to determine whether he was mentally ill and, if so, how his illness related to issues before the jury in the penalty phase. Dr. Sharma testified that defendant was psychotic when he interviewed him and in all likelihood was mentally ill before, during, and after the shootings. He agreed with the UCLA psychiatrist's diagnosis of defendant as having bipolar disorder, which is characterized by wide mood swings. In the high, or manic, phase, one with the disorder cannot sleep; has too much energy; becomes irritable, angry, and grandiose; and may be religiously preoccupied. In the low phase, he is depressed and suicidal, may not want to be bothered by anyone, and may fail

to take care of his personal appearance and hygiene. Defendant's self-reported wheeling and dealing was typical of the behavior of a person in the manic phase of the illness. Dr. Sharma testified that defendant's habitual alcohol consumption, by removing some of the rational controls he has over his behavior during a manic phase of his illness, would further increase his mental impairment.

A transcript of the guilt phase testimony of Toxicologist Ernest Lykissa, Ph.D. (summarized above), was provided to the jury during its deliberations.

### d. *Other testimony*

William Destro testified about his encounter with defendant at the Anchor Inn on March 31, 1985. His testimony was similar to his testimony at defendant's first trial.

Defendant's wife, Amalia Halvorsen, also testified along the lines of her testimony at the first trial.

Defendant's stepdaughter, Meri Halvorsen, age 20, testified that defendant was the only father she had ever known. She had a good relationship with him, although it had deteriorated somewhat during her teenage years. When she was younger, defendant had a good disposition and sense of humor, and did not drink much. In the year before he was arrested, however, he became moody and short-tempered and lost his sense of humor. He also had started drinking more in 1982 and by 1984 was drinking a lot and working much more than he previously had. After briefly moving out of her parents' house around Christmas 1984, Meri moved back home and tried to improve her behavior, which had been a bit "wild." Initially defendant seemed happy, but soon he began drinking and coming home late, losing his temper, criticizing his daughters, and destroying things around the house. On March 10, 1985, Meri was arrested for being drunk in public. After she was released from jail, defendant, who himself had been drinking, began lecturing her and, when she did not react, hit her in the face with his fist. He had not used physical discipline with her since she was in elementary school.

Defendant's uncle and aunt, William and Zella Collier, testified about defendant's upbringing in Tennessee and the odd behavior of defendant's mother, Zella's sister, Hazel Halvorsen. William testified that Hazel married Hans Halvorsen, who was at least 50 years older, when she was in her twenties. Zella testified that Hazel and Hans had two children together: Roy Harold, born in 1940, and defendant, born in 1942. Zella heard that Hazel neglected her sons' hygiene, and Hazel's housekeeping was sporadic. After defendant was grown and left home, Hazel attempted suicide with a shotgun

and was committed to a mental hospital. Later Hazel engaged in other strange acts, including one incident in which she was found standing over their mother with a knife, and another in which one of Hazel's neighbors woke to find Hazel in her apartment, standing over her. After Zella testified at defendant's first trial, she briefly visited him in jail. She saw a great change in him; he seemed solemn and troubled, and although he had not previously been particularly religious, he seemed completely focused on her salvation.

## II. ANALYSIS

### A. Competency Issues

#### 1. Governing Principles

Defendant contends the trial court erred by failing to declare a doubt as to his competency to stand trial and to conduct proceedings under section 1368, at various stages of the proceedings.

The applicable legal principles are well settled. "Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law require a trial judge to suspend proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. (§§ 1367, 1368; *Drope v. Missouri* (1975) 420 U.S. 162, 181 [43 L.Ed.2d 103, 95 S.Ct. 896]; *Pate v. Robinson* (1966) 383 U.S. 375, 384–386 [15 L.Ed.2d 815, 86 S.Ct. 836]; *People v. Welch* (1999) 20 Cal.4th 701, 737–738 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Failure to declare a doubt and to conduct a competency hearing when there is substantial evidence of incompetence requires reversal of the judgment. (*Ibid.*)" (*People v. Blair* (2005) 36 Cal.4th 686, 711 [31 Cal.Rptr.3d 485, 115 P.3d 1145].) Competency under federal law requires sufficient present ability to consult with one's lawyer with a reasonable degree of rational understanding and a rational and factual understanding of the proceedings against one. (*Dusky v. United States* (1960) 362 U.S. 402 [4 L.Ed.2d 824, 80 S.Ct. 788].) Similarly, under state law a defendant is mentally incompetent to stand trial if, as a result of mental disorder or developmental disability, he or she is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of the defense in a rational manner. (§ 1367.)

#### 2. Competency During Guilt Phase

Defendant first argues that during the guilt phase, the trial court had before it evidence suggesting that he lacked a rational understanding of the proceedings and the ability to assist his counsel, and thus committed reversible error

in failing to declare a doubt and order a hearing as to his competency. Defendant cites the testimony of several of his family members that his mood and behavior had changed in the months and weeks before the shootings, including an increase in his drinking of alcohol, with attendant memory lapses, and nightmares and unpredictable conduct. Defendant also relies on Dr. Vicary's testimony that he suffered from bipolar disorder and was psychotic at the time of the offenses and continuing until the time of trial. In particular, Dr. Vicary noted that defendant experienced paranoid delusions and "hyperreligiosity," i.e., a religious fervor of such intensity, to the exclusion of virtually any other interest, that it seemed to be part of his mental illness rather than faith alone. Defendant also, Dr. Vicary observed, distrusted him and tried to convert him and defense counsel to his religious beliefs. Defendant also points to his own testimony, which he asserts was "filled with tangential responses to the questions of counsel and strange, irrelevant statements, often marked by a seemingly psychosis-induced preoccupation with a newly embraced religion and an obsession with his own and society's unworthiness."[3] His testimony, he further notes, frequently undermined the defense case, contradicted that of other witnesses, and was internally inconsistent. Defendant even made offensive statements about the

---

[3] To give a few examples: On cross-examination, the prosecutor asked defendant if Dr. Vicary had expressed concern over his preoccupation with religion. Defendant answered: "I spoke to [Dr. Vicary] directly. [¶] I always had a direct manner. [¶] I probably offended him, what I said. [¶] I don't—when I do something, I don't mind talking about it. [¶] For instance, let me mention one subject to you, so you will understand what I am talking about. [¶] Recently coming down here on the bus, I noticed this woman. [¶] This woman had to turn sideways to get down the bus aisle, 300 pounds, in excess. [¶] The men on the bus called her huba-huba, a fitting term. [¶] Something is wrong with that woman's mind, something. [¶] It is obvious her enemy is in control, and she doesn't recognize it, just like me, all of 40 years I have been deceived. [¶] I wasn't in my right mind. [¶] This first book I was telling you about, called Gospel Principles, it is about our anti-mortal existence. [¶] We have these brothers and sisters or—where we came from that rebelled against our Heavenly Father. [¶] It is obvious— obvious where these spirits are living and perceptively take over worse and worse."

When the prosecutor questioned defendant about what he told the police after the shootings, he replied: "There is three words that I would like to bring to your attention that I think are important at this time. [¶] The first one is blatant, b-l-a-t-a-n-t. [¶] I hope everyone will verify the meaning of this word. [¶] It means offensively obtrusive and other meanings. [¶] There is another word called obvious, easily discovered, seen or understood, plain to understanding. [¶] Then one other one called implied, to express by hint or indirectly. [¶] These are important words to remember, blatant, obvious and implied."

When the prosecutor questioned defendant about an incident in which he was alleged to have brandished a gun at two men in the Signal Hill area before the charged offenses, defendant wanted to read from the Bible. Defendant testified: "A dog is sometimes used for guarding flocks, but usually held in aversion by the Israelites being regarded as half wild greedy creatures running about at will without a master and acting as public scavengers, the name as applied to false teachers and frequently by Jews to gentiles. [¶] My mother was a dog, also."

victims and inflammatory comments about religion and race, referring to Benjamin Alcala and his relatives as "Mexican thieves" and to Eugene Layton as a "gorilla."

As the Attorney General urges, however, defendant's family members' testimony regarding his past behavior did not support an inference that defendant was unable to understand the nature of the criminal proceedings or to assist his counsel in a rational manner. And "[e]ven supposing defendant is correct that the various examples of his rambling, marginally relevant speeches cited in his briefing may constitute evidence of some form of mental illness, the record simply does not show that he lacked an understanding of the nature of the proceedings or the ability to assist in his defense." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1064 [119 Cal.Rptr.2d 859, 46 P.3d 335].) As we have recognized, "more is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] . . . ." (*People v. Laudermilk* (1967) 67 Cal.2d 272, 285 [61 Cal.Rptr. 644, 431 P.2d 228].) Nor did Dr. Vicary's testimony that defendant suffered from a psychotic mental illness reasonably compel a declaration of a doubt as to his competency; Dr. Vicary himself, in fact, concluded defendant's version of events was in places false and self-serving, and he believed defendant was competent to testify despite his illness. Accordingly, because there was not substantial evidence of incompetency, the trial court did not err in failing to hold proceedings to determine defendant's competency during the guilt phase of trial.

### 3. *Competency Prior to Start of Penalty Retrial*

Next, defendant contends the trial court's finding, prior to the start of the penalty retrial, that he was unable to competently represent himself in the retrial should have led the court to declare a doubt as to his competency to proceed at all. We review the relevant portions of the record.

On August 25, 1987, the first penalty trial ended in a mistrial on the Perez murder count. The case was continued to September 14, 1987. On the latter date, defense counsel requested a continuance. The court told defendant that if he waived time for the penalty retrial, he would be beyond the time period within which he was entitled to be sentenced on the noncapital convictions, and asked if he wished to be sentenced immediately on those convictions or wait until after the conclusion of the penalty retrial. Defendant said: "No, no. I refuse that. If they didn't give me the death penalty or agree to all the charges at once, I refuse that." The court expressed uncertainty whether defendant's statement constituted a waiver. It put the matter over without a waiver in the hope that defense counsel could explain the situation to defendant.

On October 6, 1987, the trial court heard and denied a defense motion to bar further proceedings on the grounds of collateral estoppel. Defendant then personally addressed the court, asking for "a complete new trial" with "pro per status" and defense counsel's assistance. Defendant spoke of, among other things, alcohol as a drug and sellers of alcohol as "legal drug dealers that you and all the other judges are receiving money in the form of taxes from." Defendant accused the courts of being "liars and hypocrites" and asked to be allowed to represent himself, saying: "And I will prepare my case to where I have some defense. Not one word was said in my defense of the reason why I have become a murderer. I admit to being a murderer. I got in front of this court and gave you an eyewitness view of what it feels like to be a murderer. A hypocrite can't reach a decision. You are a hypocrite, sir." The court denied defendant's motion for new trial and gave him an application to proceed in propria persona. The court stated it would appoint Dr. Blake Skrdla under Evidence Code section 730 to interview defendant and report to the court his opinion as to whether defendant had the mental capacity to represent himself.

At a November 2, 1987, hearing, the court discussed Dr. Skrdla's report. Dr. Skrdla described defendant as "an alert, cooperative, loquacious fully oriented individual who spoke in a loud voice in a noticeably stereotyped tone. Thought processes were rigid, and he was very critical in attitude, with essentially bland affect. Memory was intact, and intelligence was estimated within the average to bright normal range, with ability to think abstractly. He tended to ramble somewhat in conversation, with occasional tangential remarks, and obvious preoccupation with ethical and philosophical issues. He referred to the [j]udge before whom he had been appearing as a 'hypocrite,' and described the attorneys involved as 'an unrighteous gang—in it only for the money.' He was taking no medication in custody, and felt he needed none. [¶] There was no evidence of overt psychosis, and he denied depression or suicidal ideation." Dr. Skrdla concluded: "[Defendant] understands the nature and purpose of the proceedings taken against him, and is currently capable of rational and consistent cooperation with counsel in the presentation of a defense, if motivated to do so. [¶] This examiner does not believe that [defendant] has the mental capacity to act as his own attorney at the present time. Although he has sufficient intelligence to understand the legal issues, he is so preoccupied with guilt because of his egocentric, uncaring behavior over the years that it will affect his judgment in the handling of his case. He tends to perseverate when discussing ethical, religious, and philosophical issues. Should he persist in this vein during his appearance before a jury, it is believed that he would unconsciously compromise and sabotage his case, possibly without intending to do so. Because of the intense emotional component involved, it is not believed that he is presently capable of being objective in his defense, especially in view of the seriousness of the charges.

[¶] Hence, it is this examiner's opinion that [defendant] is not presently emotionally capable of preparing and conducting his own defense in propria persona."

The court denied defendant's motion for self-representation, reasoning as follows: "Dr. Skrdla has opined that you do not have the mental capacity to act as an attorney because of a preoccupation with guilt and because of egocentric, uncaring behavior that affects your judgment. I join in that conclusion, having observed your testimony during the first trial and having had so much contact with you during all of the proceedings in this case. I note that when you were testifying and also in court in response to motions that have been made, your answers were often tangential to the issues and rambling to the point that they were really useless. I think that it's evident to me that your entire demeanor is self-destructive, and in light of the seriousness of the charges, I feel that I cannot in good conscience in this particular case for the reasons stated permit you to represent yourself." In support of its ruling, the court also cited Dr. Vicary's guilt phase testimony. (Dr. Vicary had testified that defendant was psychotic and suffered from bipolar disorder.) On January 5, 1988, defendant unsuccessfully renewed his motion before the same judge.

Again on May 2 and May 24, 1988, defendant renewed his motions for self-representation. In denying the renewed motions, the superior court judges hearing them relied on the denial of his initial motion and the reasons the court had advanced in support thereof.

Defendant contends the same evidence that led the trial court to conclude that he was incapable of representing himself during the penalty retrial due to his impaired rationality should have led it to declare a doubt as to his competency and to conduct proceedings under section 1368.[4]

We disagree. In the course of its November 2, 1987, ruling on defendant's self-representation motion, the trial court explicitly declared it had no doubt regarding defendant's competence to stand trial. This conclusion was supported by the declaration of Dr. Skrdla, who, as noted above, stated defendant understood the nature and purpose of the proceedings against him and was capable of rational and consistent cooperation with counsel in the presentation of a defense, if he chose to do so. As the Attorney General observes, the standard Dr. Skrdla was applying was the correct one for the determination of competency to stand trial, and even Dr. Vicary (whose testimony the court

---

[4] As discussed *post*, at pages 431–434, defendant alternatively contends that the trial court erred in applying a different and higher standard of competency in concluding he was incompetent to represent himself, citing *Godinez v. Moran* (1993) 509 U.S. 389, 399 [125 L.Ed.2d 321, 113 S.Ct. 2680].

alluded to in its ruling) had concluded defendant was competent to stand trial, notwithstanding his diagnosis of defendant as psychotic and having bipolar disorder. In denying the motion, the court cited defendant's lack of objectivity and the perception that, out of guilt feelings, he might unconsciously sabotage his own defense. But a lack of objectivity and a possibly self-destructive emotional approach to self-representation does not equate to substantial evidence of incompetence to stand trial. Moreover, as in the guilt phase, the record shows that defendant, despite his "bizarre actions" and "bizarre statements," understood the proceedings and could assist in his defense. (See *People v. Koontz, supra*, 27 Cal.4th at p. 1064; *People v. Laudermilk, supra*, 67 Cal.2d at pp. 283, 285.) The trial court therefore did not err in failing to declare a doubt and institute proceedings under section 1368.

### 4. *Competency During Penalty Retrial*

Third, defendant argues that, irrespective of his level of competence at the commencement of the penalty retrial, the trial court erred by failing to declare a doubt as to his competency during the retrial. Specifically, defendant asserts he acted irrationally in refusing to agree to a continuance sought by his counsel for his own benefit, pending the ruling of the Court of Appeal on a writ petition seeking to bar the penalty retrial on double jeopardy grounds; made bizarre statements during jury selection; gave testimony filled with non sequiturs, rambling and irrelevant responses, and offensive remarks; and delivered a bizarre and incomprehensible monologue before the jury concerning his study of the dictionary, his moral and religious beliefs, his preference for the death penalty over imprisonment for life without parole, and other matters. Defendant additionally argues the testimony of Psychiatrist Kaushal Sharma showed he was unable to participate rationally in his own defense: Dr. Sharma, who had interviewed defendant three times, agreed with Dr. Vicary that defendant was psychotic and with another psychiatrist who had diagnosed defendant as having bipolar disorder. Dr. Sharma stated, on cross-examination by the prosecutor, that he did not think defendant fully understood that others saw him as strange and crazy when he talked about his religion and similar matters.[5] Lay witnesses testified during the penalty retrial to defendant's deteriorating behavior before the commission of the offenses. Defendant also notes that during a conference on jury instructions, he requested the jury be asked their opinion of the proposition "that we have a heavenly father and that we cannot be forgiven unless we forgive." When the court responded that the jury could not be instructed on religious matters, but only on the law, defendant said: "That doesn't sound like the law to you then, what I had stated to you? . . . I mean, that is the law of the creator of this

---

[5] Dr. Sharma testified he had not been asked to render an opinion on defendant's competency to stand trial.

world and you and I." Finally, during his sentencing hearing, defendant gave another statement filled with references to the dictionary and his religion.

Defendant asserts the foregoing evidence raised a substantial doubt of his competency to stand trial. We disagree. Nothing in this record suggests that defendant lacked a rational understanding of the roles of the judge, prosecutor, defense counsel, or jury in this case, or the purpose of the proceedings. That he apparently viewed religious and moral questions as most salient in the normative determination of penalty, and repeatedly sought to bring them to the jury's attention, does not reflect incompetency; indeed, such matters are commonly thought to be relevant and often are presented in the defense case in mitigation. (See, e.g., *People v. Ervin* (2000) 22 Cal.4th 48, 67 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Ray* (1996) 13 Cal.4th 313, 332 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People v. Payton* (1992) 3 Cal.4th 1050, 1069 [13 Cal.Rptr.2d 526, 839 P.2d 1035].) Dr. Sharma's testimony regarding defendant's mental disorders added nothing significant to the information already before the trial court, which we have concluded failed to generate a duty to institute competency proceedings. The trial court therefore did not err in failing to declare a doubt and initiate proceedings under section 1368 during the penalty retrial. And, as we discuss below (see pp. 431–434, *post*), the circumstance that the trial court denied defendant's *Faretta* motions (see *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]) before the commencement of the penalty retrial (on the stated basis that he was mentally incapable of preparing and conducting his defense in a rational manner) does not undermine this conclusion; the court's belief that defendant was so preoccupied with guilt feelings that he likely would sabotage his own defense did not reflect any doubt regarding his competency to stand trial as defined in *Dusky v. United States, supra*, 362 U.S. 402, and section 1367.

### B. *Issues Pertaining to Guilt Phase*

#### 1. *Section 29 Issues*

Defendant contends his trial was marred by a series of errors involving section 29,[6] errors that "eviscerated" his mental state defense and deprived him of a fair trial. Specifically, defendant urges that the prosecutor improperly asked a defense witness, Forensic Psychiatrist William Vicary, whether he believed there was sufficient evidence to support a psychiatric defense,

---

[6] Section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

eliciting—over defense objection—Vicary's opinion that although defendant was psychotic and paranoid at the time of the offenses, no evidence supporting a psychiatric defense existed. Defendant further contends the trial court compounded this error by refusing a defense request for a curative instruction, modeled after section 29, that would have informed the jury that it alone was to decide whether he harbored the requisite mental states and that it could not consider expert testimony purporting to answer that question. These asserted errors, defendant contends, violated several of his rights under the federal Constitution, as well as state law.[7]

■ As noted, section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." Thus, neither side may elicit from an expert that a defendant acted with, or lacked, a particular mental state. (*People v. Smithey* (1999) 20 Cal.4th 936, 961 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Defendant contends that while Dr. Vicary did not expressly state that defendant shot the victims with malice aforethought and after premeditation and deliberation, the jury would have understood his testimony that there were "no psychiatric defenses" in this case as the functional equivalent of such an express statement.

Even assuming without deciding, as the concurring and dissenting opinion argues, that Dr. Vicary's testimony on cross-examination violated section 29, we find no prejudice. It is not reasonably probable that the result would have been more favorable to defendant in the absence of the error. (*People v.*

---

[7] With respect to this and most of the other claims raised on appeal, defendant urges that the error or misconduct he is asserting infringed various of his constitutional rights to a fair and reliable trial. In most instances, insofar as defendant raised the issue at all in the trial court, he failed to explicitly make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind that required no trial court action by defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as it was wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765]; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1195, fn. 6 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional "gloss" as well. No separate constitutional discussion is required in such cases, and we therefore provide none. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

*Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].) Indeed, we would find any error harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) Elsewhere in his testimony Dr. Vicary repeatedly emphasized that the decision whether defendant was guilty of murder or manslaughter was not a medical or psychiatric one, but properly belonged to the jurors, who would know more about the case than he did.

Moreover, Dr. Vicary's opinion to the effect that defendant's primary reason for the shootings was his psychotic mental state, specifically his paranoia, was significantly and repeatedly undercut on cross-examination by evidence of which Dr. Vicary conceded he was unaware. For example, Dr. Vicary relied on the fact that a month or two before the murders, defendant woke up screaming, telling his wife to call the police because someone was coming to kill him and his family. Dr. Vicary was unaware defendant had borrowed large sums of money from Wendell West that he was unable to repay. After reviewing loan agreements reflecting an exorbitant interest rate and other financial documents pertaining to the transactions between West and defendant, documents that defense counsel had not provided to Dr. Vicary before his testimony on direct examination, Vicary agreed that the transactions "smack[ed] of loan sharking," and he acknowledged that if a person were indebted to another and unable to repay the money, he might legitimately have nightmares and feel someone was out to get him and his family.[8] Dr. Vicary also relied on defendant's attempt to extort money from the owner of Hammett Vacuum Service in exchange for not reporting him for dumping toxic waste. Dr. Vicary had either not noticed or not known that two other individuals in their statements had acknowledged the company in fact had previously been cited for dumping toxic waste. After considering this evidence, he acknowledged he had a "totally different outlook"[9] on the extortion scheme. Dr. Vicary also relied on an alleged March 9, 1985, incident in which defendant drew a gun and demanded two individuals return property they purportedly had stolen or he would "blow [their] fucking head[s] off." Dr. Vicary acknowledged that the police report concerning this incident, dated after the capital crimes occurred, revealed that defendant told the police he believed the individuals had stolen property from him. Dr. Vicary agreed that the credibility issues surrounding the incident did not "translate into a conclusion that one side of [the] dispute [was] paranoid";

---

[8] Contrary to the implication of the concurring and dissenting opinion, Dr. Vicary did not condition his changed impression of the rationality of defendant's nightmares and fearful behavior on the *provable existence* of threats of physical harm to defendant or his family. The transactions with West clearly threatened, in the broad sense, defendant and his family with the loss of their home and his business property and vehicles.

[9] This conclusion seems to represent Dr. Vicary's ultimate position on the issue, for it appears in his cross-examination long after his reference to a "self-destructive crazy element," referenced in the concurring and dissenting opinion (*post*, at p. 440), in defendant's extortion scheme.

rather, the incident was simply one "to be measured against all the other circumstances," although in the absence of "hard and fast" evidence of actual theft (which, given defendant's admitted failure to keep an inventory of his property, would have been difficult to produce) and the individuals' expressions of fear and bewilderment at the incident, Vicary adhered to his belief it reflected paranoia on defendant's part. In sum, this powerful cross-examination seems far more significant than the one-sentence opinion in Dr. Vicary's 1985 report. We note, too, that both an instruction (CALJIC No. 2.80) and Dr. Vicary's testimony informed jurors that it was their decision alone, not the expert's, whether defendant had the required mental states; the prosecutor echoed the point ("Sir, I have no question with the fact that 12 jurors make the ultimate decision . . ."). Another instruction (CALJIC No. 3.36), moreover, told jurors they could consider, on this question, evidence that defendant had a mental disorder and was intoxicated. In light of all these circumstances, the assumed error was harmless.

For the same reason, although the trial court would not have erred in instructing the jury in the language of section 29, its refusal to do so did not prejudice defendant.

### 2. *Other Asserted Evidentiary Errors*

#### a. *Restriction on redirect examination of defense expert psychiatric witness*

After the prosecutor, in cross-examination of forensic psychiatrist Dr. Vicary, elicited the witness's opinion that the evidence in defendant's case did not support any psychiatric defenses, including a defense of insanity (see pt. II.B.1., *ante*), defense counsel in redirect examination sought to explore Dr. Vicary's understanding of the legal standard for insanity. The trial court sustained the prosecutor's objection to the line of questioning. Defendant contends the trial court violated state evidentiary law (by allowing the introduction of irrelevant and prejudicial evidence during the prosecutor's cross-examination), as well as defendant's federal constitutional rights (by inconsistently and arbitrarily restricting his counsel's redirect examination of Dr. Vicary when it had just permitted the prosecutor to cross-examine him on the same subject).

The Attorney General contends the cross-examination was relevant and that, by failing to object on constitutional grounds to the court's ruling concerning the scope of redirect examination, defendant has forfeited any constitutional claim for purposes of this appeal. Citing *People v. Yeoman, supra,* 31 Cal.4th at pages 117–118, 132–133, defendant contends that by calling the trial court's attention to the irrelevancy of the prosecutor's line of questioning, he preserved the constitutional claim he now makes.

Assuming for argument's sake defendant preserved the issue, we conclude the trial court did not err under state or federal law.

The issue arose in the following context: During cross-examination, the prosecutor asked Dr. Vicary whether the report he had prepared for defendant's trial counsel addressed issues other than those relevant to the guilt phase. Eventually the prosecutor elicited the fact Dr. Vicary had considered and rejected a plea of not guilty by reason of insanity. At sidebar, defense counsel asserted that whether Dr. Vicary thought defendant was insane was irrelevant and inadmissible, and asked what parameters the court would set on such questioning. The court stated the prosecutor had already covered insanity and inquired whether he intended to do more than that. The prosecutor responded he did not. Cross-examination of Dr. Vicary resumed. Defendant complains that despite the colloquy between court and counsel, the prosecutor continued to question Dr. Vicary about the defense of insanity, again eliciting that this case involved no insanity plea.

Defendant contends the prosecutor's questioning was irrelevant because he never entered a plea of not guilty by reason of insanity, and the issue of a defendant's legal insanity is bifurcated and tried separately from that of guilt in any event. But as the Attorney General reasons, the prosecutor engaged in the line of questioning that defendant now challenges not in order to demonstrate that Dr. Vicary did not believe defendant was legally insane, but to impeach Dr. Vicary's testimony on cross-examination that defense counsel would be incompetent if he did not present a psychiatric defense in the guilt phase, even though Dr. Vicary believed the facts did not support a psychiatric defense to the charges, and to "put in perspective" the fact Dr. Vicary similarly felt the facts did not support a plea of not guilty by reason of insanity. In other words, the prosecutor explored the inconsistency between the defense's presentation of a psychiatric defense and its nonpresentation of an insanity defense, despite Dr. Vicary's disavowal of the validity of *both* defenses on the facts of this case. The trial court acted within its discretion in precluding defense counsel from questioning Dr. Vicary on redirect examination concerning his understanding of the legal definition of insanity, due to the risk of undue consumption of time and confusion of the issues. (Evid. Code, § 352.) Nevertheless, we note the court permitted defense counsel to suggest to the jury a possible distinction between the psychiatric defense actually presented and the insanity defense not presented, by eliciting Dr. Vicary's acknowledgment, on redirect examination, that when a defendant proffers an insanity defense, he bears the burden of persuading the jury he is insane. Defense counsel also elicited from Dr. Vicary testimony reinforcing the principle that the determination whether defendant had the mental state required for the charged offenses was to be made by the jury, not the forensic psychiatrist. We see no possibility that the decision not to allow defense counsel to explore Dr. Vicary's understanding of the legal definition of

insanity, coupled with the admission of Dr. Vicary's opinion regarding the viability of an insanity defense, would have misled the jury to conclude Dr. Vicary was asserting defendant suffered from no mental disease or disorder, or otherwise prejudiced defendant. We conclude the trial court did not violate defendant's constitutional rights by imposing "asymmetrical" evidentiary standards on the parties.

b. *Restriction on direct examination of defense expert toxicological witness*

Defendant argues the trial court erred under state evidentiary law by arbitrarily preventing his trial counsel from asking a defense expert witness, Toxicologist Ernest Lykissa, Ph.D., a hypothetical question that assertedly was not supported by the evidence, while permitting the prosecutor (over defense objection) to ask the same witness a different hypothetical question that was similarly unsupported by the evidence. The Attorney General argues this contention was not preserved by a sufficiently specific objection below. Although defendant did not cite any specific ground for his objection to the prosecutor's hypothetical, his objection clearly related back to the earlier discussion the parties had about the propriety of the hypothetical questions the defense had tried to ask Dr. Lykissa, and we are satisfied defendant has preserved the state evidentiary claim for appeal.

Defendant's argument, however, lacks merit, for the prosecutor's question, unlike defense counsel's, did not assume a fact not in evidence. The defense called Dr. Lykissa, chief toxicologist at Long Beach Memorial Medical Center, to testify about the effect of alcohol consumption on blood-alcohol levels and behavior, in order to suggest that defendant had committed the charged offenses with a diminished mental state. Dr. Lykissa testified that at 7:40 p.m. the night of the shootings, defendant gave a blood sample that contained .154 percent alcohol. Based on a theoretical model male weighing 150 pounds, Lykissa testified it would take in excess of seven drinks consumed over a two-hour period before testing for the model male to register .154 percent. Defense counsel asked Dr. Lykissa: "Let's say we are talking about a male in his mid-forties who weighs approximately—between 180 and 190 pounds in weight, do you have any opinion as—in assuming that he had—he had his last drink approximately an hour and a half to two hours before a test was run on him, would you have any opinion as to the blood level at that point?" The prosecutor then objected on the ground that no evidence supported the hypothetical. At a sidebar conference, the court said: "The part that bothers me is unless [defendant] testifies—I don't know how you are going to get into the record when he had his last drink. [¶] That's a part of your hypothetical." Defense counsel responded that he would be presenting circumstantial evidence of when defendant had his last drink and

that defendant had had nothing to drink from about 10 minutes to 7:00 p.m. until the time his blood was tested at 7:40 p.m. The prosecutor objected that no such evidence had yet been presented, adding: "In fact, there is not necessarily any reason to believe there was any drinking until after the first two killings. [¶] . . . He could have had everything after the killings, but before he shot Layton, and . . . unless we get some evidence in this record, this hypothetical is unwarranted." The court ruled: "You [defense counsel] can always bring him [Lykissa] back, if necessary, but I'll sustain the objection at this time to the hypothetical."

■ Defendant acknowledges he failed to recall Dr. Lykissa to the stand. This circumstance suffices to defeat his claim of evidentiary error. Defendant argues, to the contrary, that recalling Dr. Lykissa "would not have alleviated the harm the trial court had already caused by allowing the prosecutor to pose to the expert a hypothetical question that was not supported by the evidence, even after all the evidence had been presented." As will appear, the premise underlying this argument is flawed, as the prosecutor's hypothetical question, unlike defense counsel's, was based on facts shown by the evidence. (See *People v. Ward* (2005) 36 Cal.4th 186, 209 [30 Cal.Rptr.3d 464, 114 P.3d 717] [expert may render opinion testimony based on facts given in hypothetical questions, but such questions must be rooted in facts shown by the evidence].)

To return to the examination of Dr. Lykissa: After the expert testified that defendant's blood-alcohol level was .154 percent at 7:40 p.m., the prosecutor asked: "What, if anything, can you think of [that] is inconsistent with the following hypothesis? [¶] That the individual whose blood alcohol reading was .154 at 7:40 did not have anything to drink until after 6:15 or 18:15?" The court overruled a defense objection, and Dr. Lykissa, after making some calculations on paper, responded: "Nothing."

As the Attorney General reasons, the prosecutor's question embraced facts already in evidence (the time of defendant's blood test and his blood-alcohol level) and simply asked Dr. Lykissa if those known facts were inconsistent with the possibility (or hypothesis) that the individual in question had nothing to drink until after 6:15 p.m. In contrast, the defense question to which the court sustained the prosecutor's objection asked Dr. Lykissa to assume a fact not yet in evidence, i.e., that defendant had nothing to drink after 10 minutes to 7:00 p.m. Therefore, the trial court properly excluded defendant's hypothetical and allowed the prosecutor's; hence, no differential treatment appears.

Defendant further argues the restriction on his counsel's direct examination of Dr. Lykissa violated his Sixth and Fourteenth Amendment rights to present a defense and to due process, as well as the Eighth Amendment's requirement

of a reliable determination of penalty. The Attorney General contends defendant forfeited these constitutional issues for purposes of this appeal by failing to articulate these grounds at trial. We concluded above that defendant preserved his related claim of state evidentiary error, but because the constitutional claims defendant now asserts do not simply restate his evidentiary claim on alternative legal principles, but instead require consideration of different circumstances—namely, the court's assertedly "asymmetrical" treatment of the parties' use of hypothetical questions—he has forfeited the constitutional arguments for appeal. (See, *ante*, fn. 7.) In any event, for the reasons discussed above, the trial court did not err in its rulings concerning the scope of the parties' examination of Dr. Lykissa.

### 3. *Asserted Instructional Errors*

#### a. *Failure to instruct on involuntary manslaughter as a lesser included offense of murder*

■ Defendant contends the trial court erred in failing to instruct the jury on involuntary manslaughter as a lesser included offense of murder. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 422 [79 Cal.Rptr.2d 408, 966 P.2d 442].) A trial court must instruct the jury on a lesser included offense, whether or not the defendant so requests,[10] whenever evidence that the defendant is guilty of only the lesser offense is substantial enough to merit consideration by the jury. (*People v. Breverman* (1998) 19 Cal.4th 142, 154–155, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) Substantial evidence in this context is that which a reasonable jury could find persuasive. (*Id.* at p. 162.)

■ Section 192, subdivision (b) defines involuntary manslaughter as "the unlawful killing of a human being without malice" during "the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." As defendant observes, if, in a murder case, evidence of mental illness or intoxication raises a reasonable doubt the defendant premeditated or deliberated, but establishes he did harbor malice aforethought, then he is guilty of second degree murder; if such evidence negates malice aforethought, the only supportable verdict is involuntary manslaughter or acquittal. (*People v. Saille* (1991) 54 Cal.3d 1103, 1117 [2 Cal.Rptr.2d 364, 820 P.2d 588].) Defendant contends he presented substantial evidence that he was mentally ill and intoxicated at the time of the shootings,

---

[10] Because a guilt phase jury instruction conference was not reported, the record is not entirely clear as to whether the defense requested an instruction on involuntary manslaughter as a lesser included offense of murder. The list of requested instructions submitted by defense counsel does include instructions on voluntary and involuntary manslaughter.

which could have led a reasonable jury to conclude he lacked malice aforethought. He points to the evidence, recited above, of his deteriorating mental state prior to the crimes and his consumption of alcohol on the day of the offenses, and argues the trial court therefore was required to instruct on involuntary manslaughter.

Contrary to defendant's contention, the evidence—including defendant's own testimony that he intentionally killed the victims and the manner in which they were shot—abundantly established that he intended to kill Ferguson and Perez, and nothing in the record suggested that intoxication or mental illness negated that intent. Nor was there any evidence that defendant was committing only a misdemeanor, or that he was committing a lawful act in an unlawful manner or without due caution. Moreover, in closing argument the defense essentially conceded the element of malice. Consequently, the court did not err in failing to instruct on involuntary manslaughter as a lesser included offense of murder.

b. *Instruction on mental disorder and voluntary intoxication*

Defendant contends the trial court erred in instructing the jury, pursuant to CALJIC No. 3.36, that it could consider defendant's evidence of mental illness and voluntary intoxication in deciding whether he had formed any mental state or intent required by the charged offenses.[11] He argues that, having failed to instruct on involuntary manslaughter as a lesser included offense of murder, apparently because it had determined that defendant's evidence was insufficient as a matter of law to raise a reasonable doubt as to whether defendant had acted with malice (see pt. II.B.3.a., *ante*), the trial court should have modified the instruction to make clear that the defense evidence of intoxication and mental disorder was relevant to whether he premeditated and deliberated the killings, but not to whether he acted with express or implied malice, and that the failure to do so rendered the instructions confusing and contradictory. Defendant argues the prosecutor prejudicially exploited this asserted error in his closing argument by suggesting to the jury there was no reason why the evidence would affect defendant's ability to premeditate and deliberate, yet not affect his ability to form

---

[11] Following an unreported jury instruction conference (see *ante*, fn. 10), the court, on its own motion, gave an instruction that combined the versions of CALJIC Nos. 3.36 and 4.21 in effect at the time of defendant's trial, as follows: "Evidence has been received that the defendant had a mental disorder and was voluntarily intoxicated at the time of the commission of the alleged offenses. [¶] You may consider each of these factors alone or in combination on the issue of whether or not he actually formed the required mental state or intent which is an element of any offense charged. [¶] If, from all the evidence, you have a reasonable doubt that the defendant had the required mental state or intent which is an element of any offense charged, you must give the defendant the benefit of that doubt and find that he did not have such mental state or intent as to such offense or offenses."

malice. Defendant asserts the instruction, exacerbated by the prosecutor's closing argument, violated the federal Constitution, as well as state law, because it so infected the entire trial that the resulting conviction violated due process (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475]) and deprived him of a reliable guilt phase verdict as a proper basis for the imposition of the death sentence.

The Attorney General first contends that by expressly assenting to the giving of the instruction and failing to request clarification, defendant failed to preserve the claimed error. (*People v. Lewis* (2001) 26 Cal.4th 334, 380 [110 Cal.Rptr.2d 272, 28 P.3d 34].) Defendant asserts the record does not demonstrate that his counsel acquiesced in the instruction, and even if it did, the trial court nevertheless had a duty to instruct the jury correctly (see *People v. Castillo* (1997) 16 Cal.4th 1009, 1015 [68 Cal.Rptr.2d 648, 945 P.2d 1197]), a duty that could be negated only if counsel invited the error, which he did not do here.

Assuming for the sake of argument the claim of instructional error is preserved for appeal, it nevertheless lacks merit. The essence of defendant's argument is not so much that the instruction itself was erroneous, but that, in view of the trial court's refusal to instruct on voluntary and involuntary manslaughter, the instruction might have confused the jury. We see no such potential for confusion. The modified instruction clearly did not preclude the jury from considering defendant's evidence of mental disorder and intoxication on the question whether he acted with premeditation and deliberation, the "mental states," in the language of the instruction, to which the defense had directed its presentation of such evidence. Nor did it prevent defense counsel from arguing the jury should consider such evidence only on that question (in closing argument defense counsel did tie the evidence to the issue of premeditation and deliberation, while essentially conceding malice), or from responding to the prosecutor's argument that the evidence logically would have the same effect on malice aforethought as on premeditation and deliberation. And, as the Attorney General further contends, by failing to object to the prosecutor's argument and request an admonition, defendant forfeited any claim the argument was misleading. In sum, the instruction violated neither state law nor the federal Constitution.

### c. *Refusal to instruct on unconsciousness*

■ Defendant contends the trial court erred in refusing his request for instructions on unconsciousness as a complete defense to all charges.[12]

---

[12] Defendant unsuccessfully sought to have the jury instructed with the then extant versions of CALJIC Nos. 4.30 and 4.31 (4th ed. 1979). Thus, defendant requested the jury be instructed as follows: "A person who commits an act while unconscious is not guilty of a crime. [¶] This

Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge. (§ 26, class Four; *People v. Coogler* (1969) 71 Cal.2d 153, 170 [77 Cal.Rptr. 790, 454 P.2d 686]; *People v. Newton* (1970) 8 Cal.App.3d 359, 376 [87 Cal.Rptr. 394]; see also § 20 [to constitute a crime there must exist a joint operation of act and intent].) To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist "where the subject physically acts but is not, at the time, conscious of acting." (*Newton*, at p. 376.) If the defense presents substantial evidence of unconsciousness, the trial court errs in refusing to instruct on its effect as a complete defense. (*Id.* at p. 377, citing *People v. Wilson* (1967) 66 Cal.2d 749, 764 [59 Cal.Rptr. 156, 427 P.2d 820].)

In support of his contention that the evidence warranted the giving of instructions on unconsciousness, defendant relies on Dr. Vicary's testimony that, at the time of the offenses, defendant suffered from bipolar disorder, with symptoms including psychosis and agitation, exacerbated by intoxication, as well as his own testimony that immediately before the shootings he experienced strange sensations, which he asserts were suggestive of an altered state of consciousness. Defendant also points to his testimony that he did not consciously or intentionally pull the trigger in shooting Alcala, as well as to certain inaccuracies and internal contradictions in his testimony and "gaps in his knowledge of events." Specifically, defendant cites his testimony professing unawareness as to why he drove from the Alcala scene to the Hammett Vacuum Services location, why he shot Ferguson and Perez, what route he took from the Hammett location to Eugene Layton's house, and his lack of memory of what Ferguson and Perez said to him before he shot them. Defendant also relies on certain contradictions between his own testimony and that of Alcala and Layton, contradictions that he now asserts did not

---

rule of law applies to persons who are not conscious of acting but who perform acts while asleep or while suffering from a delirium or fever, or because of an attack of epilepsy, a blow on the head, the involuntary taking of drugs or the involuntary consumption of intoxicating liquor, or any similar cause. [¶] Unconsciousness does not require that a person be incapable of movement. [¶] Evidence has been received which may tend to show that the defendant was unconscious at the time and place of the commission of the alleged offense for which he is here on trial. If, after a consideration of all the evidence, you have a reasonable doubt that the defendant was conscious at the time the crime was committed, he must be found not guilty."

In addition, defendant requested the jury be instructed: "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he were conscious, you should find that he was in fact conscious at the time of the alleged offense. [¶] If the evidence raises a reasonable doubt that he was conscious, unless from all the evidence you have a reasonable doubt that he was in fact conscious, you must find that he was then unconscious."

These instructions apparently were requested and refused during an unreported jury instruction colloquy held on August 13, 1987. The settled statement for this proceeding does not indicate why the trial court refused the instructions.

serve his legal interests. Defendant argues his testimony "raised the question of whether he actually recalled the shootings or whether he instead had filled gaps in his memory with information gleaned from other sources," and that "the jury may have concluded [defendant] was truthful with Dr. Vicary prior to trial when he told the doctor that he had no recollection of the homicides, and that his testimony to the contrary was a confabulation."

The trial court properly refused the requested instructions. Defendant's own testimony makes clear that he did not lack awareness of his actions during the course of the offenses. The complicated and purposive nature of his conduct in driving from place to place, aiming at his victims, and shooting them in vital areas of the body suggests the same. That he did not, by the time of trial, accurately recall certain details of the shootings does not support an inference he was unconscious when he committed them. The cases on which defendant relies are distinguishable: In *People v. Wilson, supra*, 66 Cal.2d at page 762, the defendant testified he did not recall shooting the victims, which was consistent with his statement to police at the time of his arrest. In *People v. Bridgehouse* (1956) 47 Cal.2d 406, 410 [303 P.2d 1018], likewise, the defendant testified his recollection of speaking with the victim just before the shooting was "very hazy," he had a "very vague memory" of the victim springing from the couch, and the next thing he remembered was pulling the trigger of his gun on empty cartridges; he characterized his action as "distorted by a haze of mental void." He had made similar statements to the police when he was arrested. (*Ibid.*) Thus, in both *Wilson* and *Bridgehouse*, the defendants testified to a mental state consistent with unconsciousness and with prior statements to police. In contrast, defendant in this case testified in sharp detail regarding the shootings. That he earlier had told Dr. Vicary he did not remember them does not, without more, suggest his testimony about the crimes was mere confabulation. In sum, because defendant presented no substantial evidence he was unconscious when he committed the offenses, the trial court did not err in refusing the instructions on unconsciousness as a complete defense. (See *People v. Stitely* (2005) 35 Cal.4th 514, 551 [26 Cal.Rptr.3d 1, 108 P.3d 182] [trial court need not give instructions absent substantial evidence to support them].)

Even if the trial court acted properly in denying his request for an instruction that unconsciousness is a complete defense, defendant further argues the trial court erred in failing to instruct sua sponte on involuntary manslaughter based on unconsciousness. (CALJIC No. 8.47; see § 22; *People v. Breverman, supra*, 19 Cal.4th at p. 155; *People v. Graham* (1969) 71 Cal.2d 303, 316–317 [78 Cal.Rptr. 217, 455 P.2d 153].) Such an instruction is required when there is evidence deserving of consideration that the defendant was unconscious due to voluntary intoxication. Defendant rehearses at length the evidence that around the time of the offenses, he daily and habitually drank to excess with resultant memory losses, and that on the day of the

shootings he spent the afternoon drinking at the Anchor Inn bar, producing a blood-alcohol level that measured .154 percent at the time of his arrest some two hours after the shootings (and might, according to the testimony of Dr. Lykissa, have approached .20 percent at the time of the shootings).

As discussed above, the record is lacking in substantial evidence that defendant was not conscious of his criminal actions within the meaning of section 26, class Four. Accordingly, the trial court did not err in failing to instruct on involuntary manslaughter on a theory of unconsciousness due to voluntary intoxication.

### 4. Sufficiency of Evidence of Murder

Defendant contends the evidence in this case does not support the jury's findings that the Ferguson and Perez homicides were committed with premeditation and deliberation, and that his first degree murder convictions therefore violate section 189 and his state and federal constitutional rights and must be reversed. For the reasons set forth below, we disagree.

"In reviewing a criminal conviction challenged as lacking evidentiary support, ' "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754].)" (*People v. Combs* (2004) 34 Cal.4th 821, 849 [22 Cal.Rptr.3d 61, 101 P.3d 1007]; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) "An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)" (*Combs*, at p. 849.)

 "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation . . . does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' " (*People v. Koontz, supra*, 27 Cal.4th at p. 1080.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942], this court reviewed earlier decisions and developed guidelines

to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation. (*People v. Young* (2005) 34 Cal.4th 1149, 1183 [24 Cal.Rptr.3d 112, 105 P.3d 487].) We described three categories of evidence recurring in those cases: planning, motive, and manner of killing. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159]; *Anderson*, at p. 27.) The *Anderson* decision stated: "Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing]." (*Anderson*, at p. 27; see *Perez*, at p. 1125.) Since *Anderson*, we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight. (*Young*, at p. 1183; *Perez*, at p. 1125.)

Defendant contends there was no evidence he planned to kill Ferguson and Perez or that he had any motive to do so. He argues the killings were the product of his mental illness, intoxication, and unconsidered impulse rather than of a deliberate judgment or plan carried out according to a preconceived design.

Defendant first asserts he did not know that either Ferguson or Perez, or anyone else, would be in the area of the Hammett Vacuum Service at McDonough and I Streets when he arrived there, outside business hours, on the evening of Sunday, March 31, 1985, at a time for which he had previously made dinner plans with his wife and another couple. The record, he notes, suggests the killings occurred less than 10 minutes after he shot Benjamin Alcala; impliedly, he claims the interval was too short for him to have planned the fatal shootings. The Ferguson brothers were about 30 to 40 feet from the intersection where defendant stopped his truck, and the evidence stood in conflict on the question whether defendant called out to Calvin Ferguson, or whether Ferguson walked over to defendant of his own accord; in any event, defendant shot Ferguson within seconds of his approaching defendant's truck. Apparently without significant delay, defendant then drove ahead some 50 to 70 feet and stopped his truck in front of Vernon Lovelace's gate on McDonough Street. Lovelace testified that Perez's car, coming from the opposite direction, pulled alongside defendant's truck. Perez's driver's side window was rolled halfway up. Defendant testified Perez said something to him, although he could not remember what; defendant then stuck his hand out of the window of his truck and fired the gun at Perez. This sequence of events, defendant urges, fails to support an inference of any planning activity and instead suggests he did not plan to kill either victim.

Other evidence, defendant asserts, showed that he had no motive for killing Perez or Ferguson. Delton Ferguson testified he knew of no bad blood

between his brother and defendant and that to his knowledge they had never even met. Defendant testified he previously had seen Perez in the area, but did not know him. He testified he did not know why he shot Ferguson and Perez. Nothing in these circumstances, defendant argues, supports an inference that he had a motive to kill the victims.

Defendant also contends that nothing about the manner in which he killed each victim—a single gunshot, without reloading his gun or taking any further steps to ensure either victim had been killed—shows he had a preconceived design to take their lives.

Finally, defendant relies on Dr. Vicary's testimony he was psychotic, paranoid, agitated, and acting impulsively at the time of the shootings, and Dr. Lykissa's testimony that the level of intoxication defendant was experiencing at that time would impair his thought processes and alter his social judgment, in support of his argument that the evidence was insufficient to support the first degree murder verdicts.

We conclude the evidence supports the jury's finding of premeditation and deliberation. Defendant's purposive actions in driving to seek out various persons and then killing them, viewed in a light favorable to the judgment, indicate defendant had some motive for his killings—a method to his madness—and that is enough. The record suggests the motive may have been related to defendant's feelings about his desperate financial state, as each of the locations where defendant committed the shootings—the yard outside the home of defendant's business associate, Roberto Martinez, where defendant shot Benjamin Alcala; the street near the premises of the Hammett Vacuum Service, from whose owner defendant had attempted to extort money, where defendant killed Calvin Ferguson and Vicente Perez; and the home of Eugene Layton, with whom defendant had engaged in business dealings and whom he tried to kill there—conceivably had some connection, in defendant's mind, to his financial troubles. With respect to the murders, neither Ferguson nor Perez in any way provoked the shooting or struggled with defendant, whose demeanor at the time was described as "cold." (See *People v. Marks* (2003) 31 Cal.4th 197, 232 [2 Cal.Rptr.3d 252, 72 P.3d 1222] ["calm," "cool," and "focused" manner of shooting supported finding of premeditation and deliberation].) The jury was free to accept Delton Ferguson's testimony that defendant "hollered" from the intersection, which suggested defendant had some purpose in drawing Calvin Ferguson toward him, and within moments fatally shot him. In any event, as the Attorney General observes, this court has " 'never required the prosecution to prove a specific motive before affirming a judgment, even one of first degree murder. A senseless, random, but premeditated, killing supports a verdict of first degree murder.' [Citation.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 519 [7 Cal.Rptr.2d 199,

828 P.2d 101].) The evidence of defendant's planning activity and evident deliberation in the Layton shooting could support an inference that his mental illness did not interfere with his ability to deliberate less than an hour earlier, when he killed Ferguson and Perez. Moreover, Ferguson and Perez were shot in the head or neck from within a few feet, a method of killing sufficiently " 'particular and exacting' " to permit an inference that defendant was "acting according to a preconceived design" (*People v. Caro* (1988) 46 Cal.3d 1035, 1050 [251 Cal.Rptr. 757, 761 P.2d 680]; see also *People v. Morris* (1988) 46 Cal.3d 1, 23 [249 Cal.Rptr. 119, 756 P.2d 843]), and defendant's testimony showed he was well aware that shooting a person in the face or neck would kill him. We conclude the jury's verdict of first degree murder is supported by sufficient evidence.

### 5. *Cumulative Error*

Defendant contends the cumulative effect of the errors assertedly committed during the guilt phase of his trial rendered the trial fundamentally unfair and the first degree murder verdicts constitutionally unreliable. (See generally *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868]; *Beck v. Alabama* (1980) 447 U.S. 625, 637–638 [65 L.Ed.2d 392, 100 S.Ct. 2382].) But we have found no error in this phase of the trial, and as to the assumed error in the admission of Dr. Vicary's opinion concerning defendant's mental state, we concluded any possible error did not affect the verdict. Hence, defendant's contention must fail.

### 6. *Superfluous Multiple-murder Special-circumstance Finding*

■ Defendant correctly notes that two multiple-murder special-circumstance allegations were erroneously charged and found true in this case. (*People v. Avena* (1996) 13 Cal.4th 394, 425 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 787 [230 Cal.Rptr. 667, 726 P.2d 113]; *People v. Harris* (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433].) In numerous cases involving the same kind of error, we have stricken the superfluous finding and concluded the defendant suffered no prejudice. (See, e.g., *Avena*, at p. 425; *People v. Jones* (1991) 53 Cal.3d 1115, 1149 [282 Cal.Rptr. 465, 811 P.2d 757].) We do so again here. (See also *Brown v. Sanders* (2006) 546 U.S. 212, 220–221 [163 L.Ed.2d 723, 733, 126 S.Ct. 884] [invalidated special circumstance produces constitutional error only when the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor].)

C. *Issues Pertaining to First Penalty Trial and Proceedings Prior to Penalty Retrial*

1. *Propriety of Mistrial Declaration*

Defendant contends the trial court abused its discretion when it failed to make sufficient inquiry into whether there existed legal necessity to declare a mistrial after the jury reached an impasse during the first penalty phase, and further erred in concluding the jury was deadlocked. Defendant additionally contends he did not consent to the mistrial, thereby rendering the penalty retrial a violation of his state and federal constitutional protections against double jeopardy. The Attorney General argues the defense impliedly consented to the mistrial and that, in any event, the trial court acted within its discretion in declaring the mistrial. As will appear, we agree legal necessity supported the trial court's action.

The issue arose in the following context. About 2:00 p.m. on Friday, August 21, 1987, after closing arguments by counsel and instructions by Judge Sterry Fagan, who had presided over the evidentiary portion of the trial, the jury retired to deliberate as to the penalty. At 3:30 p.m., Judge Fagan excused the jury for the weekend, directing it to return the following Monday, August 24. The jury resumed deliberations that Monday morning, with Judge Eugene Long rather than Judge Fagan presiding. The jury took lunch from 12:00 p.m. to 1:45 p.m. and then resumed deliberations. At 4:00 p.m., the jury indicated it had reached a partial verdict; apparently without notifying counsel, Judge Long ordered the partial verdict sealed, excused the jury, and directed it to return the following morning.

Jury deliberations resumed on Tuesday, August 25, with Judge Long again presiding. Sometime that morning, the foreperson of the jury sent the court a note advising that the jury was "unable to reach a unanimous decision regarding the penalty of life in prison or death in Count II." After receiving the note, Judge Long called counsel for both sides into his chambers and asked for suggestions on how to proceed. Defense counsel suggested the court bring the jurors into the courtroom and ask them individually if any further deliberations would be productive. Mr. Carbaugh, a deputy district attorney standing in for the trial prosecutor questioned whether, given the length and complexity of the case, any inquiry was necessary at that point. Defense counsel reiterated his suggestion that the court determine whether the jury was deadlocked or whether further deliberations would be productive and proposed that, if the foreperson indicated they would not be productive, the jurors be polled on that point. Carbaugh agreed and suggested the jury additionally be asked about the number of ballots taken and the numeric breakdown of the various ballots. Defense counsel assented. Judge Long then

asked: "Assuming that you are satisfied after inquiry that they have taken enough polls and that they all unanimously agree that they are deadlocked and no further deliberations or assistance of the court by way of any further instructions or re-reading of the testimony, then what do you suggest, taking the verdict on [count] I and declare a mistrial as to [count] II?" Carbaugh said he would "probably want to be heard . . . . [¶] I'll simply wait and ask to approach side bar on that issue." The court noted it would be glad to hear what Carbaugh had to say, adding: "Assuming we all agree that no further—" Carbaugh spoke: "Then the procedure the court suggested is proper." The court clarified: "Take the verdict on Count I and declare a mistrial on Count II and excuse the jury?" Defense counsel and Carbaugh each assented.

The court then called the jury into the courtroom, read aloud the jury's note, and asked whether the jury felt the court could do anything to assist it in further deliberations toward arriving at a verdict on count II. The foreperson answered in the negative. The court polled the jurors individually, asking whether each felt that with further deliberations they might arrive at a verdict on count II. All said no. Noting that the jury had been deliberating since Friday afternoon, the court asked how many ballots had been taken as to count II. The foreperson answered: "[B]etween eight and ten." The court asked: "Without telling me as to guilty or not guilty [sic], just the numerical count, has it changed much?" The foreperson responded: "No, it hasn't." The court probed further: "What is it, again, without telling me the penalty, whichever way it was, the death or life, the numerical count, without telling me which was which, is it 6/6, 11/1, 10/2?" The foreperson responded: "It was 10/2 in one instance and . . . 8/4." The court asked: "Which was which, as you concluded? [¶] Where do you stand?" The foreperson replied: "The first, 10/2, was with regards to death; the 8/4 was regards to life."

The court and counsel then conferred at sidebar. Carbaugh observed that the foreperson had not really answered the court's question as to where the jury stood as of the last ballot and suggested they get an answer to that question. The court said: "I gather it stayed pretty much the same. . . . He said, apparently, they voted 10 to 2 for death—we don't know which way—and 8 to 4 for life." Carbaugh argued: "I don't care about death or life. I'm concerned about which way, away from the 8 to 4 or away from the 10 to 2, and I think that's probably counsel's inquiry." Defense counsel agreed. The court asked what purpose further inquiry would serve. Carbaugh responded: "To find out if there is some movement." The court said: "They said, 'No.' They have had eight to ten ballots." Carbaugh alluded to the interest in conserving judicial resources by avoiding another two-month trial if possible, and noted: "[A]pparently, there has been some movement. [¶] Again, we don't know which way, away from a verdict or towards a verdict." After the court again noted the balloting "hasn't changed much, 10 to 2, 8 to 4," Carbaugh observed: "Two votes. That's actually a fair change, considering

the short period of time." Defense counsel said: "One gets the impression they were 10 to 2 for death at one point and now 8 to 4 for life." The court noted: "I'm just concerned about what may come blurting out. [¶] I get the impression they are deadlocked." Nevertheless, the court expressed willingness to send the jury back for further deliberations. Carbaugh said: "That's agreeable." Defense counsel said: "It's not agreeable with me, but that's why you are a judge and I'm an advocate. [¶] . . . I think they are hung and they are not going any place." At defense counsel's suggestion, the court then asked the foreperson to elaborate on the numerical splits in the balloting that he previously had referred to. He responded: "We went through the procedure and we carried on the discussion regarding the death penalty decision and were working with the death penalty decision by itself and took several ballots in regards to the death penalty, and I would say it was approximately six or eight ballots in that regard, and the numbers came out approximately the same." The court interjected: "What you told me was 10 to 2." The foreperson continued: "Then we decided, 'Well, maybe it would be of some benefit to discuss life imprisonment,' and we took other ballots after more deliberations in that regard, and the ballots regarding that penalty came out approximately the same, 8 to 4. [¶] It was 7 to 5 at one time, 8 to 4—the numbers were along those lines, yes, and the 8 to 4—the last two ballots, as a matter of fact." The court asked: "And the 10 to 2 was the last ballot on the several balloting as to death?" The foreperson replied: "That was about the last two or three, yes." The court then declared itself satisfied that further deliberations could not possibly lead to a verdict on count II. Accordingly, it took the verdict on count I, polled the jury as to that count, declared a mistrial as to count II, and discharged the jury.

██ The federal and state Constitutions protect persons against being twice placed in jeopardy for the same offense. (U.S. Const., 5th Amend.; *Benton v. Maryland* (1969) 395 U.S. 784, 794 [23 L.Ed.2d 707, 89 S.Ct. 2056] [applying 5th Amend. to states through 14th Amend. due process clause]; Cal. Const., art. I, § 15.) Retrial after discharge of a jury without "manifest" (in federal terminology) or "legal" necessity violates the protections afforded under both charters. Jury deadlock constitutes necessity for declaration of a mistrial and permits retrial of the defendant. (*United States v. Perez* (1824) 22 U.S. (9 Wheat.) 579, 580 [6 L.Ed. 165]; *Paulson v. Superior Court* (1962) 58 Cal.2d 1, 5 [22 Cal.Rptr. 649, 372 P.2d 641].) This principle is codified in section 1140, which prohibits discharge of the jury after the case is submitted to it until it has rendered a verdict, unless by consent of both parties or it appears there is no reasonable probability the jury can agree, and section 1141, which permits retrial under such circumstances. (See *People v. Fields* (1996) 13 Cal.4th 289, 300 [52 Cal.Rptr.2d 282, 914 P.2d 832]; see also § 1160 [permitting the jury, in a trial of multiple charges, to return a verdict on the charge or charges on which they agree and permitting retrial of the

charges on which they do not agree].) The determination whether there is a reasonable probability of agreement rests in the sound discretion of the trial court, based on consideration of all the factors before it. (*People v. Rojas* (1975) 15 Cal.3d 540, 546 [125 Cal.Rptr. 357, 542 P.2d 229].)

The trial court here did not abuse its discretion in finding no reasonable possibility the jury could reach a verdict on count II. The jury so advised the trial court by written note; in open court, the foreperson confirmed that the jurors had considered and rejected the possibility that rereading of testimony or further instructions could assist them in reaching a verdict; after eight to 10 ballots taken over the course of some seven hours 40 minutes' deliberation spanning three days, the jury remained divided as to the penalty on count II; and each juror, when individually polled, expressed the view that further deliberations would not enable the jury to come to a verdict on that count. The record simply does not support an inference that a reasonable possibility existed that the jury could have arrived at a verdict if told to deliberate further.

Defendant contends that because the duration of the jury's deliberations was not long for a capital case involving complex issues, and because some jurors apparently changed their votes during the course of the deliberations, the trial court had an obligation to question the jury further regarding the evident movement of the votes before declaring a mistrial. Defendant also observes that during the more than seven hours of deliberations preceding the mistrial declaration, the jury presumably discussed and reached a verdict on count I, the Ferguson murder count; thus, precisely how much time it spent discussing count II, the Perez murder count, is unknown. While defendant acknowledges the period of deliberations is not determinative (*In re Chapman* (1976) 64 Cal.App.3d 806, 816 [134 Cal.Rptr. 760]), he argues the trial court erred in concluding that the jury had deliberated sufficiently on count II.

We disagree. Although apparently some members of the jury—precisely how many was unclear—had changed their votes over the course of deliberations, none indicated in response to the court's questioning that there was any prospect of achieving a unanimous verdict. Each affirmed there was nothing the court could do to assist them in arriving at a verdict. Under these circumstances, that an order to deliberate further would have resulted in a verdict is sheer speculation, and the trial court did not abuse its discretion in declaring a mistrial.

In light of this conclusion, we need not address the Attorney General's argument that defense counsel impliedly consented to the mistrial declaration.

### 2. *Constitutionality of Section 1053 and Propriety of Substitution of Trial Judge*

As noted, for reasons not disclosed on the record, Judge Fagan, who had presided over defendant's trial, was absent from court on Monday and Tuesday, August 24 and 25, 1987, while the first jury was deliberating on penalty. Without objection from either side, Judge Long substituted for Judge Fagan during those two days. On Monday, August 24, the jury returned a partial verdict, which Judge Long ordered sealed; he then excused the jury and directed it to return the following day at 9:30 a.m.

Jury deliberations resumed the next day, August 25, with Judge Long presiding. That morning, after the jury announced itself unable to reach a verdict regarding the penalty for the Perez murder, and following discussion with counsel and questioning of the foreman and other jurors, Judge Long declared a mistrial on the Perez count and entered the jury's verdict of life imprisonment on the Ferguson count. Judge Long then set the matter of the Perez count for pretrial conference and trial setting on September 14, 1987.

On the latter date, Judge Fagan resumed presiding over the proceedings.

Defendant contends that section 1053, which permits the midtrial substitution of judges in criminal cases,[13] violates his federal constitutional right to a fair trial, and that the retrial of penalty, following the assertedly improper substitution and Judge Long's declaration of a mistrial, violated his right not to be placed twice in jeopardy for the same offense. Defendant also contends that the substitution of Judge Long violated section 1053 in any event because no showing was made that Judge Fagan was unable to proceed, as required by the statute. We conclude that defendant failed to preserve these contentions, but even if we were to address their merits, he has not established entitlement to relief.

By way of background, we explained in *People v. Espinoza* (1992) 3 Cal.4th 806, 828 [12 Cal.Rptr.2d 682, 838 P.2d 204] that "[t]he notion that the federal right to *jury* trial is violated by the midtrial substitution of a *judge* has its origin in a 1915 federal case, *Freeman* v. *United States* (2d Cir. 1915) 227 Fed. 732. That case held that the Sixth Amendment right to a trial by jury entitled a criminal defendant to 12 jurors, as well as a judge, 'all of whom must remain identical from the beginning [of trial] to the end.' (*Id.*, at p. 759.) Recently, in *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1211 [275 Cal.Rptr.

---

[13] Section 1053 provides in relevant part: "If after the commencement of the trial of a criminal action or proceeding in any court the judge or justice presiding at the trial shall die, become ill, or for any other reason be unable to proceed with the trial, any other judge or justice of the court in which the trial is proceeding may proceed with and finish the trial . . . ."

729, 800 P.2d 1159], we mentioned *Freeman* and more recent authorities (*Randal* v. *Beto* (5th Cir. 1965) 354 F.2d 496, 500 and fn. 5; 2 Wright, Federal Practice & Procedure: Criminal 2d (1982) § 392, pp. 402–403) as providing 'abstract support' for the proposition that the right to jury trial includes a trial before a single trial judge." But we concluded in *Espinoza* that the "essential purpose" of the Sixth Amendment jury trial guarantee— preventing " 'oppression by the Government' "—is served by " 'the interposition between the accused and his accuser of the commonsense judgment' of laypersons [citation] at a trial presided over by a neutral judicial officer" (*Espinoza*, at p. 829) and was not implicated by the midtrial substitution of another superior court judge for the original trial judge, which was compelled by the latter's serious illness and inability to continue with the trial. (*Ibid.*)

Defendant acknowledges our holding in *People v. Espinoza, supra*, 3 Cal.4th at page 829, that midtrial substitution of judges does not implicate the right to jury trial, but he contends section 1053 is nevertheless unconstitutional because it lacks certain procedural safeguards to protect his right to a fair trial. Specifically, he argues it violates the fair trial guarantee by failing to permit substitution only in extraordinary circumstances involving the judge's genuine inability to preside, and only after the substituting judge has certified on the record that he or she has familiarized himself or herself with the prior proceedings. According to defendant, and not controverted by the Attorney General, California is the only jurisdiction, state or federal, that permits midtrial substitution of judges without the consent of the defendant and without such safeguards. Defendant notes that in *Espinoza*, the record established both that the original judge was unable (due to serious illness) to proceed with the trial and that the substitute judge familiarized himself with the record of proceedings; hence, he argues, *Espinoza* cannot be read as dispensing with those conditions. Defendant further urges that the asserted constitutional violation is a structural error, reversible per se (see *Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302, 111 S.Ct. 1246]), but that if we determine a harmless error standard applies, he was prejudiced by Judge Long's erroneous declaration of a mistrial and his subsequent reprosecution.

At the threshold, the Attorney General argues defendant forfeited the contention by failing to challenge the constitutionality of section 1053 below. Defendant responds that we may entertain a constitutional challenge to a statute for the first time on appeal and should do so here because "the enforcement of a penal statute is involved [citation], the asserted error fundamentally affects the validity of the judgment [citation], or important issues of public policy are at issue [citation]." (*Hale v. Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512]; see also *People v. Blanco* (1992) 10 Cal.App.4th 1167, 1172–1173 [13 Cal.Rptr.2d 176] [whether to

address the constitutionality of a statute for the first time on appeal is a discretionary determination for the reviewing court].)

 We need not address defendant's constitutional challenge here. Contrary to defendant's argument, the improper substitution of a judge, unlike a biased adjudicator, does not appear to be the type of error that cannot be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." (*Arizona v. Fulminante, supra,* 499 U.S. at pp. 308–309.) Accordingly, under the applicable harmless error standard (see *Chapman v. California, supra,* 386 U.S. 18), defendant would not be entitled to relief because any possible error in the substitution of Judge Long was harmless beyond a reasonable doubt. Judge Long made no evidentiary or instructional rulings that would have required familiarity with the particulars of the case and, contrary to defendant's argument, we have found no error in his declaration of a mistrial on penalty as to the Perez murder count.

Turning to defendant's contention that the substitution of Judge Long for Judge Fagan violated section 1053 because the record does not reflect that Judge Fagan was *unable* to preside (see *People v. Truman* (1992) 6 Cal.App.4th 1816, 1825–1827 [9 Cal.Rptr.2d 138] [error to substitute another judge so that presiding judge could attend to "supervisorial duties"]), we conclude defendant forfeited the contention by not objecting below. (*People v. Burgener* (2003) 29 Cal.4th 833, 886 [129 Cal.Rptr.2d 747, 62 P.3d 1].) This case perfectly exemplifies the basis for the forfeiture doctrine, for, had defendant objected, either the record would reflect why Judge Fagan was unable to preside or Judge Fagan would in fact have presided. Were the rule otherwise, defendants "would be discouraged from making timely objections since, if the ultimate judgment were unfavorable, the defendant 'would receive a second "bite at the apple". . . .' [Citation.]" (*Id.* at p. 887.) We therefore need not address the question of what kind of "inability" to preside satisfies section 1053. Even had the contention been preserved for appeal, for the reasons discussed above in connection with defendant's related constitutional claim, any possible error was nonprejudicial.

### 3. *Effect of Separate Penalty Verdicts for Each Murder Victim*

Defendant contends that the trial court committed reversible error in allowing the prosecutor to seek separate penalty verdicts for each of the two murder victims, Ferguson and Perez, and that retrial of the penalty phase as to the Perez count undermined the reliability of the death verdict and violated the state and federal constitutional prohibitions against double jeopardy.

A brief procedural recitation will place this claim in perspective. Before the start of the first trial, defendant unsuccessfully moved to strike one of the two

multiple-murder special-circumstance allegations (the only such allegations against defendant), citing *People v. Harris, supra,* 36 Cal.3d at page 67, which held that only one such special circumstance is properly alleged when multiple murders are charged; he also asked that the jury be directed to render only one penalty verdict, asserting that two penalty verdicts would, in effect, punish him twice for one capital offense, in violation of the state and federal Constitutions. During the guilt phase jury instruction conference, defendant reiterated his argument that only one multiple-murder special-circumstance allegation was proper, and he unsuccessfully objected to the court's giving the jury two special circumstance verdict forms. During the penalty phase jury instruction conference, defendant unsuccessfully renewed his objection to giving the jury penalty verdict forms for each murder conviction. After the trial court declared a mistrial when the jury was unable to reach a verdict as to the penalty for the Perez murder conviction, defendant entered a plea of once in jeopardy and unsuccessfully moved to bar retrial on the ground that relitigation of the issue of penalty would violate the doctrine of collateral estoppel. Defendant then sought a writ of prohibition in the Court of Appeal, claiming that a penalty retrial was barred by the federal and state Constitutions because the trial court had erred in allowing multiple special circumstances and multiple penalty verdicts. The Court of Appeal denied the writ, and this court denied review.

■ Although he acknowledges we previously have approved the use of multiple penalty verdicts in cases involving only the multiple-murder special circumstance (see, e.g., *People v. Sandoval* (1992) 4 Cal.4th 155, 197 [14 Cal.Rptr.2d 342, 841 P.2d 862]), defendant first contends that because he could be given only a single sentence of either life without parole or death for "a single multiple-murder capital offense," only one verdict was proper in his case. Defendant's premise is faulty: His two murder convictions constituted *two* capital offenses, not one, regardless of the circumstance that only one multiple-murder special-circumstance finding may be had. Contrary to defendant's argument, *Williams v. Superior Court* (1984) 36 Cal.3d 441 [204 Cal.Rptr. 700, 683 P.2d 699] does not hold otherwise. In that case, the defendant contended the trial court erred in denying severance of two murder charges, and this court, on a petition for writ of mandate, held the possibility of prejudice inherent in joinder of the charges warranted severance. Defendant relies on our comment in *Williams* that "since one of the charged crimes is a capital offense," we had to analyze the severance issue with a greater degree of scrutiny than is normally applicable in a noncapital case. (*Id.* at p. 454.) Defendant reads too much into the comment, which appears simply to have been an allusion to one of the factors courts consider in analyzing severance claims (see *id.* at p. 452), but in any event cannot reasonably be interpreted as signifying that *two* charged murders *together* constitute *one* capital murder for which only one death verdict may be had. Nor is this

court's disapproval in *People v. Harris, supra*, 36 Cal.3d at page 67, of the practice of alleging two multiple-murder special circumstances in a double murder case (on the basis that doing so would "improperly inflate[] the risk that the jury will arbitrarily impose the death penalty") inconsistent with permitting separate penalty verdicts for each of the murders. The language of section 190.2 further supports the use of separate verdicts in this situation: The statute provides that the multiple-murder special circumstance applies to multiple *murders*, even if one is only in the second degree, yet the death penalty can be imposed only for a first degree murder conviction. Thus, the two murders do not "merge" into one capital crime, as defendant seems to argue. In sum, defendant's argument lacks merit.

Because we reject defendant's premise that his two murder convictions together constituted but one capital crime, it follows the retrial of the penalty phase for the Perez murder conviction, after the first jury was unable to reach a verdict, did not violate principles of double jeopardy under either the state or the federal Constitution. Defendant's additional contention, that the penalty retrial violated the doctrine of collateral estoppel because the first jury's determination that life imprisonment was the appropriate verdict, likewise lacks merit because the first jury did not reach a determination as to the penalty for the Perez murder conviction.

### 4. *Denial of Defendant's Requests for Self-representation*

After the first trial ended and before the penalty retrial began, defendant made four unsuccessful motions for self-representation under *Faretta v. California, supra*, 422 U.S. 806. On appeal, he contends the denial of the motions constituted reversible error. The Attorney General argues the motions were untimely and therefore were properly denied.

Some procedural detail will place the *Faretta* issue in context. On August 25, 1987, after the jury returned a verdict of life without the possibility of parole for the murder of Calvin Ferguson, the trial court declared a mistrial when the jury was unable to reach a penalty verdict for the murder of Vicente Perez. Defendant's case was continued to September 14, 1987. On September 14, defense counsel requested a continuance, and, after some unresolved discussion of whether defendant was willing to wait until the conclusion of the penalty retrial to be sentenced on the noncapital counts, the matter was put over. On October 6, 1987, the trial court (Judge Fagan) heard and denied defendant's motion to bar proceedings on the ground of collateral estoppel, after which defense counsel stated that defendant wished to address the court. Defendant asked for "a new trial, a complete new trial. That would require a pro per status. And I would like to ask for Mr. Torelli's assistance as counsel." Defendant asserted, among other things: "I will prepare my case to

where I have some defense. Not one word was said in my defense of the reason why I have become a murderer." Judge Fagan denied defendant's request for a new trial, indicated he would give defendant a written petition to proceed in propria persona to fill out, and stated he would appoint Dr. Blake Skrdla under Evidence Code section 730 to interview defendant and report on whether he had the mental capacity to represent himself. The judge then continued the matter. On November 2, 1987, Judge Fagan resumed proceedings on defendant's request for self-representation, noting he had received a letter from Dr. Skrdla that expressed the opinion that, although defendant understood the nature and purpose of the criminal proceedings and could cooperate with counsel if he chose to do so, his mental problems would prevent him from preparing and conducting his defense in a rational manner. Judge Fagan again continued the matter pending research on the legal standard applicable to *Faretta* motions.[14] On November 24, 1987, after considering the authority cited by the prosecutor, Judge Fagan denied the motion, concluding defendant lacked the mental capacity to represent himself and was self-destructive.

Defendant made a second motion to represent himself in a hearing before Judge Fagan on January 5, 1988. When the judge asked if he had any new circumstances on which to base the motion, defendant cited "equal protection principles," called his attorney "a court-appointed puppet who fails the legal requirements of counsel, but who is really a wash-out, living on welfare payments from the court disguised as legal fees," and complained about a "snitch," who he contended had been monitoring his movements in jail for the last two years. Defense counsel commented that the prosecutor had acknowledged a jailhouse informant had been previously involved in the case but would not be used at trial. Judge Fagan denied the motion for the reasons he had cited in denying the first motion.

Defendant made a third motion for self-representation in a hearing before Judge Sheldon on May 2, 1988. Noting Judge Fagan had previously denied a *Faretta* motion by defendant, Judge Sheldon denied the motion without prejudice to a renewed motion showing a change of circumstances.

---

[14] The prosecutor noted that Dr. Skrdla had not found defendant incompetent to stand trial and interpreted his letter as saying, in essence, that defendant was merely making an unwise choice in seeking to represent himself. The judge disagreed, saying he understood Dr. Skrdla to be saying that because of mental problems defendant was incapable of preparing and conducting his defense in a rational manner. Defense counsel suggested the matter be put over to allow the parties to research whether the legal standard for competency to stand trial was the same as that for self-representation. The prosecutor expressed confidence the standards were the same under California law, finding support in *People v. Kurbegovic* (1982) 138 Cal.App.3d 731, 755–756 [188 Cal.Rptr. 268] (involving the same prosecutor).

Finally, defendant made a fourth motion for self-representation in a hearing on May 24, 1988, before Judge Nott, who ultimately presided over defendant's penalty retrial. Judge Nott asked defendant if he would be ready to start the trial that day; defendant answered affirmatively. Asked if he had anything to add, defendant discoursed on morality and the meaning of "priestcraft" and "carpe diem." Judge Nott denied defendant's motion for self-representation, noting that two other judges had already heard and denied the motion, and independently finding defendant incompetent to represent himself based on Dr. Skrdla's report and defendant's propria persona petition.

■ As noted, defendant contends the denial of his motions for self-representation violated his rights under *Faretta*. ". . . *Faretta* holds that the Sixth Amendment grants an accused personally the right to present a defense and thus to represent himself upon a timely and unequivocal request. (*People v. Marshall* [(1997)] 15 Cal.4th [1,] 20–21 [61 Cal.Rptr.2d 84, 931 P.2d 262].) The right to self-representation obtains in capital cases as in other criminal cases (*People v. Clark* (1990) 50 Cal.3d 583, 617 [268 Cal.Rptr. 399, 789 P.2d 127]), and may be asserted by any defendant competent to stand trial—one's technical legal knowledge, as such, being irrelevant to the question whether he knowingly and voluntarily exercises the right (*Godinez v. Moran*[, *supra*,] 509 U.S. [at pp.] 399–400 . . . ; *People v. Joseph* (1983) 34 Cal.3d 936, 943–944 [196 Cal.Rptr. 339, 671 P.2d 843])." (*People v. Dunkle* (2005) 36 Cal.4th 861, 908 [32 Cal.Rptr.3d 23, 116 P.3d 494].) The stated basis for the trial court's denial of defendant's motion for self-representation—his supposed mental incapacity not amounting to incompetency to stand trial—therefore was invalid.

■ This conclusion does not end the matter, however, because the timeliness of one's assertion of *Faretta* rights is critical.[15] "In *People* v. *Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187], this court held that, 'in order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial.' (*Id.* at pp. 127–128.) 'However, once a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court.' (*Id.* at p. 128; *People v. Bloom* (1989) 48 Cal.3d 1194, 1220 [259 Cal.Rptr. 669, 774 P.2d 698].)" (*People v. Hardy* (1992) 2 Cal.4th 86, 193–194 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

---

[15] Even when the trial court does not state it is denying a *Faretta* motion on the ground of untimeliness, we independently review the record to determine whether the motion would properly have been denied on this ground. (*People v. Dent* (2003) 30 Cal.4th 213, 218, 222 [132 Cal.Rptr.2d 527, 65 P.3d 1286].)

 Because the phases of a capital trial are stages of a unitary trial, not distinct trials, we have held a motion made after the guilt phase verdicts have been returned is untimely. (*People v. Hardy, supra,* 2 Cal.4th at pp. 194–195; see also *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1006–1007 [30 Cal.Rptr.2d 818, 874 P.2d 248].) None of the cases in which we have considered a motion for self-representation made between the guilt and penalty phases of a unitary capital trial, however, involved a motion made after the penalty phase had *ended in a mistrial,* when the retrial would take place before a different jury. The rationale behind the rule giving the trial court the discretion to deny an untimely *Faretta* motion—to avoid disruption of an ongoing trial—thus is not implicated in this case. Jury selection in the penalty retrial did not actually commence until seven months after defendant's first motion for self-representation. Under these circumstances, defendant's motion was timely, and the trial court had no discretion to deny it. We therefore must reverse the penalty judgment. This conclusion renders it unnecessary to address defendant's further argument that the trial court had no discretion to deny his second, third and fourth motions for self-representation.

In light of this conclusion, we need not address defendant's remaining claims pertaining to his penalty retrial.

## III. DISPOSITION

We affirm the judgment as to guilt, vacate one of the two multiple-murder special-circumstance findings, and reverse the judgment as to the sentence of death.

George, C. J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I agree with the majority's reversal of the judgment of death because of the trial court's error in denying defendant's motion for self-representation at the penalty phase of the trial; and I agree with vacating as duplicative one of the two multiple-murder special-circumstance findings. I disagree, however, with the majority's affirmance of the judgment as to guilt, and in particular with the affirmance of the two convictions for murder in the first degree and the remaining multiple-murder special-circumstance finding. I would vacate those convictions and that finding because of the trial court's prejudicial error in allowing the prosecutor to ask a defense expert witness, Dr. William Vicary, a forensic psychiatrist, whether he thought there was substantial evidence to support a "psychiatric defense" to the charges in this case. Dr. Vicary's opinion was inadmissible under Penal Code section 29, and its admission resulted in substantial prejudice to defendant on the first degree murder charges and the associated special circumstance allegation, requiring reversal.

# I

On March 31, 1985, in three separate incidents spanning less than two hours, defendant shot four men, killing two of them. Defendant was then 43 years old, and he was self-employed doing construction work, distributing soft drinks through vending machines, and buying and selling various items.

Defendant spent the afternoon immediately before the shootings at a bar in Long Beach, where he unsuccessfully attempted to cash some checks and to sell a number of gold chains that he said were then on a ship in the harbor. Throughout the afternoon, defendant drank heavily.

In the first incident, defendant went to an apartment building in Long Beach around 6:00 p.m. looking for Roberto Martinez, whom defendant suspected of stealing some equipment from him. Benjamin Alcala, who had seen defendant once before but had never met him, told defendant that Martinez was not home. Defendant retrieved a gun from his car and shot Alcala in the upper back. Alcala survived.

Defendant then drove his pickup truck about a mile to an industrial area in Wilmington where he had briefly worked the year before for a business called Hammett Vacuum Service. There he found Calvin Ferguson, who was working on his own truck. Defendant yelled to Ferguson, who walked toward defendant's truck. Within a minute, defendant shot Ferguson in the head, killing him.

Defendant drove forward around 100 feet and stopped. Vicente Perez pulled his car alongside defendant's truck. The vehicles were facing in opposite directions with the two driver's side doors next to each other. Defendant leaned out of his truck, extended his arm, and shot Perez through the neck, killing him.

Shortly after 7:00 p.m., defendant arrived at the door of Eugene Layton's home in Long Beach. Layton had purchased roofing gravel, used refrigerators, and soft drinks from defendant. Layton's 13-year-old son answered the door and called Layton, who invited defendant in. As they were walking through the house, defendant pulled a gun and said, "You're dead, Gene, you're dead." Defendant fired, hitting Layton twice in the chest. Layton pushed defendant into a china cabinet, smashing the glass, and he managed to take defendant's gun away and to cut defendant's throat with a piece of broken glass. Paramedics arrived and took both Layton and defendant to the hospital. At 7:40 p.m., immediately after the shootings, defendant's blood-alcohol level was 0.154 percent, a level that would cause serious impairment of mental functioning.

Testifying in his own behalf at the guilt phase of the trial, defendant admitted shooting all four victims. He said he shot Alcala because he believed Alcala was lying when he told defendant that Roberto Martinez was not at their residence. Defendant did not explain why he shot Calvin Ferguson, and he claimed not to remember what Ferguson said to him. Defendant admitted that he intended to kill Vicente Perez, but he testified he did not know why he did it. Defendant said he went to Layton's house to collect money from him on behalf of some people to whom Layton allegedly owed $500,000.

## II

Penal Code section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

Here, during the guilt phase of defendant's capital trial, defense witness Dr. William Vicary testified as an expert witness about defendant's mental illness. Specifically, he testified on direct examination that at the time of the shootings defendant was suffering from bipolar disorder, a chronic and severe mental illness that produced both psychosis, which Dr. Vicary explained is "where you lose your grip on reality," and paranoia, which Dr. Vicary described as "an idea or series of ideas that's not based on reality." Other symptoms included depression, restlessness, frustration, despair, and impulsiveness.

Over defense objection, the trial court permitted the prosecutor on cross-examination to ask Dr. Vicary whether he had advised defendant's attorney "that there just was insufficient evidence to present a psychiatric defense," and Dr. Vicary affirmed that he had expressed that opinion and still held it. He agreed with the prosecutor that a psychiatric defense is "where, as a result of whatever the psychiatric evidence is, the defense may be able to raise a reasonable doubt as to whether or not the required mental states were there." On further cross-examination, he testified that he did not think "there was sufficient evidence to support what we call a diminished intent defense . . . to knock it down from murder one to murder two . . ." and "that there was insufficient evidence to even raise a reasonable doubt."

That testimony was inadmissible under Penal Code section 29. The only reasonable interpretation of Dr. Vicary's testimony that there was "insufficient

evidence to present a psychiatric defense," insufficient evidence "to knock it down from murder one to murder two," and "insufficient evidence to even raise a reasonable doubt" was that, in his opinion, during the fatal shootings of Calvin Ferguson and Vicente Perez defendant had the mental state necessary for first degree murder. Penal Code section 29 prohibits such testimony.

The majority does not deny that the trial court erred in permitting the prosecutor to ask defense expert witness Vicary whether, in his opinion, there was sufficient evidence to support a psychiatric defense. Rather, the majority concludes that the admission of that testimony did not prejudice defendant. (Maj. opn., *ante*, at p. 408.) No prejudice resulted, the majority reasons, because "Dr. Vicary repeatedly emphasized that the decision whether defendant was guilty of murder or manslaughter was not a medical or psychiatric one, but properly belonged to the jurors, who would know more about the case than he did" and also because his opinion about defendant's mental illness and its symptoms "was significantly and repeatedly undercut on cross-examination by evidence of which Dr. Vicary conceded he was unaware." (*Id.* at p. 409.) I examine both of these reasons.

The majority is correct that Dr. Vicary testified that "[t]he ultimate issue as to whether somebody is . . . to be found guilty of first degree murder as opposed to second degree murder or manslaughter is not a psychiatric decision" or "a medical decision" but instead "a decision that properly belongs to the jurors." But the main effect of the trial court's error was to lead the jury to discredit Dr. Vicary's testimony on direct examination describing defendant's serious mental illness and its symptoms. There is a reasonable probability that, had the prosecutor's cross-examination of Dr. Vicary been properly limited as required by Penal Code section 29, the jury would have entertained a reasonable doubt that defendant acted with premeditation and deliberation when he killed Calvin Ferguson and Vicente Perez.

The prosecution's only theory of first degree murder for the fatal shootings of Calvin Ferguson and Vicente Perez was murder with premeditation and deliberation. "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485]; accord, *People v. Jurado* (2006) 38 Cal.4th 72, 118 [41 Cal.Rptr.3d 319, 131 P.3d 400].) Thus, "[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543 [26 Cal.Rptr.3d 1, 108 P.3d 182].)

In some situations, a defendant's conduct in shooting a series of people within a short space of time may strongly indicate that each of the shootings was deliberate and premeditated. If, for example, the victims are complete strangers and the defendant shoots each of them immediately upon encountering them, one may infer a preexisting intent to murder strangers selected either randomly or because of some obvious shared characteristic (such as race, ethnicity, gender, age, clothing style, etc.). Or, if the victims are all persons the defendant regarded as enemies, one may infer a preexisting intent to murder all such persons. Here, however, the four individuals that defendant shot were not strangers selected at random or because of a shared characteristic, nor were they persons that defendant regarded as enemies. Defendant's victims included both complete strangers and persons with whom defendant had prior dealings, and the victims did not share any apparent characteristic that could have caused defendant to preselect them as victims. In this situation, it is far from obvious that each shooting occurred as a result of some preexisting homicidal plan.

"A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.' " (*People v. Jurado, supra*, 38 Cal.4th at pp. 118–119.)

The prosecution here presented no evidence that defendant had a preexisting motive to kill either Calvin Ferguson or Vicente Perez. The majority asserts that "[d]efendant's purposive actions in driving to seek out various persons and then killing them, viewed in a light favorable to the judgment, indicate defendant had some motive for his killings—a method to his madness . . . ." (Maj. opn., *ante*, at p. 421.) But there is no evidence that defendant sought out either Ferguson or Perez, or even that he knew they would be in the area where he encountered them. The majority also speculates that the motive for each shooting "may have been related to defendant's feelings about his desperate financial state" (*ibid.*), but there is no evidence in any way linking either Ferguson or Perez to defendant's financial difficulties. Thus, I conclude there is no evidence of a preexisting motive to kill either Ferguson or Perez.

Nor was there evidence of planning activity with respect to the fatal shootings of Calvin Ferguson or Vicente Perez. The majority asserts that eyewitness testimony that defendant shouted to Ferguson "suggested defendant had some purpose in drawing Calvin Ferguson toward him." (Maj. opn., *ante*, at p. 421.) Perhaps so, but the purpose could have been something other than to kill him. Defendant may have intended to ask Ferguson a question,

and then suddenly formed a rash impulse to kill him based on Ferguson's response or on something in his manner.

Finally, the manner of killing—a sudden gunshot to the head or neck at close range—although strongly indicating an intent to kill, does not clearly indicate premeditation or deliberation and is entirely consistent with killings occurring as a result of an unconsidered or rash impulse. Thus, the jury here was presented with very little, if any, of the three kinds of evidence that this court has relied upon to measure the sufficiency of the evidence of premeditation and deliberation, making the existence of premeditation and deliberation as to the killings of Calvin Ferguson and Vicente Perez close issues.

Had the trial court's error not led the jury to discredit it, the testimony of defense expert Dr. Vicary about the nature and symptoms of defendant's mental illness could have persuaded a reasonable juror to conclude that defendant did not premeditate or deliberate the murders of Calvin Ferguson and Vicente Perez, and that those murders were therefore of the second rather than the first degree. Dr. Vicary testified to his opinion that at the time of the fatal shootings defendant was suffering from a chronic and severe mental illness—bipolar disorder—that caused him to lose his grip on reality (psychosis) and to misinterpret harmless behavior as threatening (paranoia). He also testified that the symptoms of defendant's illness included restlessness, frustration, and impulsiveness, suggesting that when faced with a perceived threat, defendant would be easily frustrated and likely to act without thinking. Finally, he testified that alcohol intoxication made defendant's symptoms worse. Taken together, Dr. Vicary's testimony provided strong support for the defense theory that the killings of Ferguson and Perez were the product of unconsidered and rash impulse, rather than preexisting thought and reflection, and that, as to each victim, defendant was therefore guilty of second rather than first degree murder.

The majority asserts, however, that the opinions about defendant's mental illness and its symptoms that defense expert Dr. Vicary expressed on direct examination were "significantly and repeatedly undercut on cross-examination by evidence of which Dr. Vicary conceded he was unaware." (Maj. opn., *ante*, at p. 409.) The majority gives three examples as support for this assertion.

In the first example, the majority observes that "Dr. Vicary relied [on direct examination] on the fact that a month or two before the murders, defendant woke up screaming, telling his wife to call the police because someone was coming to kill him and his family." (Maj. opn., *ante*, at p. 409.) On cross-examination, Dr. Vicary conceded he was unaware that defendant had borrowed large sums of money from Wendell West on terms that suggested

loan sharking and that defendant may have been unable to repay the debt. According to the majority, this new information caused Dr. Vicary to concede that "if a person were indebted to another and unable to repay the money, he might legitimately have nightmares and feel someone was out to get him and his family." (Maj. opn., *ante*, at p. 409, fn. omitted.) In fact, Dr. Vicary did not testify that merely being unable to repay a debt could cause a normal person to have the kind of nightmare that defendant reportedly had experienced. Rather, he testified on cross-examination that "[i]t's possible if a loan shark had been *threatening him and threatening the family* that that would have be [*sic*] a realistic basis for such a nightmare and a reaction, and *if that is true*, then that would not be paranoia." (Italics added.) But no evidence was ever presented that Wendell West or anyone else had ever threatened defendant or his family. Accordingly, this cross-examination did not undercut Dr. Vicary's testimony.

The majority describes the second example this way: "Dr. Vicary also relied on defendant's attempt to extort money from the owner of Hammett Vacuum Service in exchange for not reporting him for dumping toxic waste. Dr. Vicary had either not noticed or not known that two other individuals in their statements had acknowledged the company in fact had previously been cited for dumping toxic waste. After considering this evidence, he acknowledged he had a 'totally different outlook' on the extortion scheme." (Maj. opn., *ante*, at p. 409, fn. omitted.) On direct examination by the defense, Dr. Vicary noted that defendant had been calling this company "several times a day for a week," had identified himself by name, was never able to speak to the company's owner, and had made his extortion demands to "a number of his employees and underlings." The reports and statements furnished to Dr. Vicary indicated that defendant persisted in making the demands even after an employee told him the company had already been cited for toxic dumping. Dr. Vicary remained of the view that defendant's conduct during this incident reflected mental illness: "There is a self-destructive crazy element to this man's persistence by calling this owner and trying to extort this $10,000 for a citation that the guy had already been given."

This is the majority's description of the third example: "Dr. Vicary also relied on an alleged March 9, 1985, incident in which defendant drew a gun and demanded two individuals return property they purportedly had stolen or he would 'blow [their] fucking head[s] off.' Dr. Vicary acknowledged that the police report concerning this incident, dated after the capital crimes occurred, revealed that defendant told the police he believed the individuals had stolen

property from him. Dr. Vicary agreed that the credibility issues surrounding the incident did not 'translate into a conclusion that one side of [the] dispute [was] paranoid'; rather, the incident was simply one 'to be measured against all the other circumstances . . . .' " (Maj. opn., *ante,* at pp. 409–410.)

Here again, the majority provides something less than the full picture. Although defendant told an investigating officer that he believed the two individuals had stolen from him, defendant "couldn't prove it . . . he just had a feeling that they had stolen from him." Defendant could not even identify the property he believed had been stolen. Although Dr. Vicary conceded that the individuals might have stolen from defendant, Vicary remained of the view that, in the absence of any rational ground for defendant's belief, the incident was evidence of defendant's paranoid thinking. On cross-examination by the prosecutor, Dr. Vicary put it this way: "Now, if you come up [with] the proof—you come up with it or the detective comes up with it or the investigator for the lawyer comes up with it, I'll be happy to change my mind, but until you do, this piece of evidence suggests this element of paranoia and it kind of fits in with all the other pieces." No evidence that the two individuals had actually stolen from defendant was ever produced at defendant's trial.

To sum up: Defendant shot and killed Calvin Ferguson and Vicente Perez, with whom defendant had little or no prior acquaintance, for no apparent reason during a chance encounter. The evidence of premeditation and deliberation was weak. Defense witness Dr. Vicary testified to his opinion that during the shootings defendant suffered from a mental illness that produced paranoia and impulsive behavior, and that alcohol intoxication magnified those symptoms. There is a reasonable probability that this testimony could have persuaded the jury to return verdicts of second rather than first degree murder for the two fatal shootings. The trial court's error in admitting testimony barred by Penal Code section 29, however, likely caused the jury to completely discount Dr. Vicary's entire testimony about the existence and nature of defendant's mental illness. Apart from the erroneously admitted evidence, Dr. Vicary's testimony describing defendant's mental illness and its symptoms was not substantially undercut by the prosecution's cross-examination. After the prosecutor called Dr. Vicary's attention to some information of which Dr. Vicary was previously unaware, Dr. Vicary maintained his opinion that defendant suffered from a chronic and serious mental illness and that "[t]he primary reason for these unprovoked attacks is [defendant's] psychotic mental state, specifically his paranoia."

For these reasons, I conclude that the trial court's error was prejudicial and requires that defendant's first degree murder convictions be either reversed or reduced to second degree murder, and that the multiple-murder special-circumstance finding be vacated. I therefore dissent from the majority's affirmance of the judgment as to guilt.